Fred LORENZ and Linda Lorenz

v.

J. Donald WATSON, Bioren & Co., John F. Bunn, Jr., and John C. Korn, partners in Bioren & Co., New York Stock Exchange and John F. Bunn, Jr., and John C. Korn, members of the New York Stock Exchange.

Civ. A. No. 39390.

United States District Court
E. D. Pennsylvania.

Sept. 20, 1966.

Laurence H. Eldredge, Philadelphia, Pa., for plaintiffs.

Francis Hopkinson, Philadelphia, Pa., for New York Stock Exchange.

Alexander Conn, Philadelphia, Pa., for Bioren, Bunn and Korn.

## OPINION AND ORDER

JOHN W. LORD, Jr., District Judge.

This action for damages is brought under the Securities Exchange Act of 1934 (15 U.S.C.A. § 78a et seq.). The matter is presently before the Court on the motions of the Exchange, Bioren, John C. Korn and John F. Bunn, Jr., for dismissal, and on the motion of the defendants Bioren, Korn and Bunn for summary judgment in their favor.

It should be noted that the defendant J. Donald Watson is not presently represented before the Court, and that a default judgment was entered against him on March 17, 1966 for failure to appear, to plead or otherwise defend the action.

### FACTS

It appears from the complaint that during the period from November, 1963 until April, 1964, the plaintiffs, an elderly couple, entrusted their entire

savings to the defendant Watson for investment purposes. The savings consisted of approximately $3,800.00 in cash and approximately 899 shares of Delaware Fund which were later converted into $10,100.00 in cash. During this period, the defendant Watson was employed by the defendant Bioren as a salesman. Bioren and its partners were members of the New York Stock Exchange, and the defendant Watson was a registered representative thereof.

It is alleged that through improper handling of their account by the defendant Watson, all but $700.00 was lost within the brief period mentioned above. The improprieties complained of included, *inter alia*, inappropriate investment maneuvers, margining the account without authority, extensive trading and churning disproportionate to the size and character of the account, and acting primarily for the purpose of creating commissions, rather than on behalf of, or in the interest of, the plaintiffs. It is further asserted that the defendant Watson, in violation of the provisions of the constitution and the rules of the Exchange, falsely represented to the plaintiffs that he had the qualifications and authority to trade their account in a discretionary fashion.

Bioren, Korn, Bunn and the Exchange are said to be responsible and liable for the damages thus accruing on the theory that they failed to properly supervise the activities of the defendant Watson, and because they did not carefully investigate his background before placing him in a position whereby he could effect the improprieties now alleged.) In support of this argument the plaintiffs present two alternate theories. First, that all of the above defendants are rendered liable for the misfeasance of Watson by virtue of Section 20 of the Act which deals with the liability of controlling persons.) Second, that their conduct constituted a violation of the constitution and rules of the Exchange from which a civil action for damages ensues.

Finally, it is asserted that all of the defendants presently before the Court were negligent in their supervision of the defendant Watson, and that this Court has pendent jurisdiction of these common law claims.

## DISCUSSION

The defendants Bioren, Korn and Bunn challenge this Court's jurisdiction on substantive grounds, asserting that none of the facts alleged in the complaint give rise to liability under the Act. The defendant, Exchange, has made a timely objection to venue in this District.

## SUR THE MOTION OF THE EXCHANGE

The charges against the Exchange are that it failed to (1) carefully investigate the background of the defendant, Watson, and (2) that it failed to properly supervise his activities. In the Court's judgment, neither of these claims, individually or jointly, are sufficient to establish the Eastern District of Pennsylvania as the proper venue.

■ Under Section 27 of the Act an action may be brought under Section 10 (b) and Rule 10b–5—the section and rule chosen by the plaintiffs in this action—in the district (1) where any act or transaction constituting the violation occurred, (2) wherein the defendant is found, (3) where the defendant is an inhabitant, and (4) where it transacts business. See e. g. New Park Mining Company v. Cranmer, 225 F.Supp. 261, 267 (S.D.N.Y.1963). The plaintiffs do not maintain that the Exchange is "found" within the Eastern District of Pennsylvania, or that it "transacts business" here, or, finally, that it is an inhabitant hereof. Indeed, it would be difficult for them to so argue in view of the abundance of authorities to the contrary. See Sperry Products v. Association of American R. R., 132 F.2d 408, 145 A.L.R. 694 (2nd Cir. 1942), cert. denied 319 U.S. 744, 63 S.Ct. 1031, 87 L.Ed. 1700 (1943); Noerr Motor Freight, Inc. v. Eastern R. R. Presidents Con., 113 F.Supp. 737 (E.D.Pa.1953); Midwest Fur Producers Ass'n v. Mutation Mink Breeders Ass'n., 102 F.Supp.

649 (D.Minn.1951) and authorities contained therein; 1 Moore, Federal Practice ¶ 0.142 [5] (2 ed. Supp. 1964); see especially the excellent opinion of my colleague, Judge Davis, in Stern Fish Co. v. Century Seafoods, Inc., 254 F.Supp. 151 (E.D.Pa.1966).

However, the plaintiffs do maintain that the Exchange comes within the first category; that is, that it committed an act or engaged in a transaction within the Eastern District of Pennsylvania so as to render it vulnerable to suit therein. The Court disagrees.

The Court will assume, for purposes of deciding the motion, that the Exchange had the responsibility of investigating the defendant, Watson's, background, and of supervising his activities. It will also concede that inaction or non-action, when there is a duty to act, will give rise to civil liability as readily as will affirmative conduct. However, it is one thing to interpret inaction as constituting a valid basis for liability where there is a duty to act, and quite another to use it for purposes of establishing venue. Cf. Platt Corp. v. Platt, 17 N.Y.2d 234, 270 N.Y.S.2d 408, 217 N.E.2d 134 (1966); Feathers v. McLucas, 15 N.Y.2d 443, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965); Rufo v. Bastian-Blessing Co., 405 Pa. 12, 173 A.2d 123 (1961).

■ Section 27 of the Act is a special venue provision, and venue is to be established only in compliance with its terms. In the view this Court takes, any omission on the part of the Exchange took place in New York where it conducts its affairs. There is nothing in the way of legislative history which suggests that Congress intended so broad an interpretation of this provision, nor is such an interpretation necessary to attain the basic objective of adequately protecting the investing public.

■ The motion of the Exchange to dismiss will, therefore, be granted. This, of course, makes it unnecessary to discuss the common law claims. There being no jurisdiction as to the Exchange under the Act, there is nothing to which the common law claims could append.

## SUR THE MOTION OF BIOREN, KORN AND BUNN

The plaintiffs have brought their action under Section 10(b) of the Exchange Act (48 Stat. 891 (1934), as amended, 15 U.S.C.A. § 78j (1964)) and Rule 10b–5 promulgated thereunder. (17 C.F.R. § 240.10b–5 (1964)). Section 10(b) provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange—

\*     \*     \*     \*     \*     \*

"(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

Rule 10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

The plaintiffs assert that Watson's conduct operated as a fraud upon them, and that Bioren, Korn and Bunn controlled Watson within the meaning of Section 20 of the Act, and, consequently, that they are liable therefor.

Bioren, Korn and Bunn raise a number of defenses. First, it is asserted that none of the activities alleged by the plaintiffs rise above mere improprieties, and therefore that no action has been stated under Section 10(b) and Rule 10b–5. Second, it is argued that the plaintiffs failed to allege deception, and that their complaint must therefore be dismissed. Third, the defendants assert that they did not "control" the defendant Watson, within the meaning of Section 20. Next, it is argued that, in any event, the action is barred by the statute of limitations, and, finally, that the plaintiffs have failed to allege specifically that the fraud was perpetrated by the use of "an instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange."

■ An examination of the complaint confirms the defendants' argument respecting the plaintiffs' failure to allege the use of an instrumentality such as would be necessary to bring the action within the cognizance of the Court. Although the Court will not take judicial notice of this aspect of the case, it would be wasteful of considerable time and effort to dispose of the matter now on the basis of this technicality. The plaintiffs have expressed their willingness to file an appropriate motion to amend their complaint in this regard, and the Court will entertain it. This, of course, will not preclude the defendants from later proving the absence of this element. The Court now proceeds to the merits.

■ The concept of civil liability ensuing from a violation of the Act where no such remedy is specifically provided therein had its genesis in this district when my colleague, Judge Kirkpatrick, delivered his opinion in the case of Kardon v. National Gypsum Co., 69 F.Supp. 512 (E.D.Pa.1946). See also 73 F.Supp. 798 (E.D.Pa.1946) and 83 F.Supp. 613 (E.D.Pa.1947) involving the same case. That principle is not now seriously open to question. (See the cases which follow that ruling collected in Ruder, Civil Liability Under Rule 10b–5: Judicial Revision of Legislative Intent, 57 Nw.U.L.Rev. 627, 629–635 (1963)). The Supreme Court in J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), by implying a right of action under § 14(a) of the Act, strengthens that conclusion. Therefore, to avoid dismissal of their action the plaintiffs need only allege facts which, when fairly interpreted in connection with the provision invoked, constitute a violation of the Act. It is clear to the Court that they have done so.

■ It is true that the regulations enacted pursuant to 10b–5 do not specifically mention churning or excessive trading as constituting a violation of Section 10(b). However, to conclude on that basis alone that no cause of action is stated thereunder would be adhering to the letter of the statute without regard to its intended purpose.

■ It should be observed that Section 15(c) (1) of the Act (15 U.S.C.A. § 78o (c) (1)), one of the sections dealing with broker-dealer frauds, includes within its description of the term "manipulative or deceptive device or contrivance" transactions which are "excessive in size or frequency in view of the financial resources and character of such account." (17 C.F.R. 240.15c1–7(b) (1964)). This definition is certainly instructive to the Court on the issue as to whether the conduct asserted in the complaint amounted to fraud or a manipulative or deceptive device within the meaning of Section 10(b) and Rule 10b–5 thereunder. Moreover, the decisions of the Commission in certain disciplinary proceedings also indicate that excessive trading for the purpose of creating commissions amounts to fraudulent conduct within the meaning of Section 10(b) and Rule 10b–5 thereunder. See e. g., Reynolds & Co., et al, 39 S.E.C. 902 (1960); R. H. Johnson & Co., 36 S.E.C. 467 (1955) aff'd per curiam sub nom R. H. Johnson & Co.

v. S.E.C., 97 U.S.App.D.C. 364, 231 F.2d 523 (1956), cert. denied 352 U.S. 844, 77 S.Ct. 48, 1 L.Ed.2d 60 (1956); Behel, Johnsen & Co., 26 S.E.C. 163 (1947); Looper & Co., 38 S.E.C. 294 (1938); cf. Shearson, Hammill & Co., CCH Fed.Sec. L.Rep. ¶ 77,306 (Nov.1965).

In the Court's judgment, taking commissions to which one is not entitled differs little from misappropriation of funds. Cf. Merrill Lynch, Pierce, Fenner & Beane, 31 S.E.C. 494 (1950); D. S. Waddy & Co., 30 S.E.C. 367 (1949). If there is a difference, it lies in the fact that the former is more invidious, since the latter is far simpler to detect.

## NECESSITY OF ALLEGING DECEPTION

The Court does not agree with the defendants that it was necessary for for the plaintiffs literally to allege deception. When entertaining actions under the anti-fraud provisions of the Securities Exchange Act, the courts are not bound by common law principles of substance or pleading. In view of the facts alleged in the complaint, it is impossible to conclude otherwise than that the plaintiffs are complaining that they were, in fact, deceived. In order to decide differently, it would be necessary to assume that the plaintiffs willingly gave their entire savings to the defendant, Watson, with full knowledge that he had the intention of excessively trading their account.

The Court believes that the better view is that enunciated in Ellis v. Carter, 291 F.2d 270 (9th Cir. 1961) where the court answered a similar argument as follows:

"Section 10(b) speaks in terms of the use of 'any manipulative device or contrivance' in contravention of rules and regulations as might be prescribed by the Commission. It would have been difficult to frame the authority to prescribe regulations in broader terms. Had Congress intended to limit this authority to regulations proscribing common-law fraud, it would probably have said so. We see no reason to go beyond the plain meaning of the word 'any', indicating that the use of manipulative or deceptive devices or contrivances of whatever kind may be forbidden, to construe the statute as if it read 'any fraudulent' devices." (at p. 274).

The statement of Judge Clark in one of the most significant cases dealing with discretionary accounts is also appropriate.

"To say, as petitioner does, that every element of common law fraud must be proven in order to validate the revocation of a broker-dealer registration is to say that Congress had no purpose in enacting regulatory statutes in this field and that its legislation in the field is meaningless. On the contrary, it has long been recognized by by the federal courts that the investing and usually naive public needs special protection in this specialized field." Norris & Hirshberg v. Securities & Exchange Com'n., 85 U.S.App. D.C. 268, 177 F.2d 228, 233 (1949) (citations omitted).

These principles are as readily applicable to civil actions under the Act, as they are to broker-dealer revocation proceedings.

The defendants' reliance on the case of O'Neill v. Maytag, 339 F.2d 764 (2nd Cir. 1964) is misplaced. An examination of the lower court's opinion in that case (230 F.Supp. 235 (S.D.N.Y. 1964)) indicates that there the plaintiff sought to recover in a shareholder's derivative action for what amounted to corporate mismanagement. There the plaintiff alleged that the securities transaction in question constituted "illegal waste and spoliation of the assets of [the corporation]." The facts alleged in the case before this Court go well beyond simple breach of a fiduciary duty. And as Chief Judge Lumbard pointed out in O'Neill v. Maytag, supra, 339 F.2d at p. 768, "There is no reason * * * why the acts of an agent * * * may not violate both his common law duty

and the duty imposed by Rule 10b–5. * * * [D]eception may take the form of nonverbal acts," citing Cochran v. Channing Corp., 211 F.Supp. 239 (S.D. N.Y.1962) where the deception consisted of reducing dividends with the purpose of reducing the price of the corporation stock.

■ Accordingly, the Court finds that the complaint sufficiently alleges fraud within the meaning of Section 10 (b) and Rule 10b–5.

■ The defendants raise an incidental point to which little attention is accorded in the brief, and, so far as the Court is concerned, understandably so. This involves the matter of sale or purchase. It is argued that: "Nowhere in the complaint is there to be found an allegation that any of the defendants either sold to or purchased from (in interstate sale or otherwise) the plaintiffs any securities." (p. 8 of Defendants' Brief in support of the motions).

In effect, the defendants argue that there must be privity between the purchaser and seller of securities, and since there can be none where one handles another's account as a broker and not as a dealer, the action must fall.

This argument is unacceptable. It ignores the clear terminology of Section 10(b) and Rule 10b–5, which only require that the fraud occur "in connection with the sale or purchase of securities," and it suggests that the only change over Section 12(2) of the Securities Act sought to be effected by enactment of Section 10(b) of the Exchange Act was that purchasers were also to be protected. The Court disagrees. Had Congress intended this narrow result, it could and would have expressed it in terms free of ambiguity. It chose to use the broader "in connection with," rather than merely adding purchase to sale. To adopt the interpretation advanced by the defendants would be to shun the readily observable distinction between the terms "in the sale or purchase," and "in connection with the sale or purchase."

■ Accordingly, the Court finds that the activity of Watson, on behalf of himself and of the other defendants, constituted a fraud "in connection with the sale or purchase of securities" within the meaning of Section 10(b) and Rule 10b–5 thereunder.

### LIABILITY OF CONTROLLING PERSONS

Having found, for the purpose of ruling on the defendants' motion, that Watson committed a fraud in violation of the Act, it is now necessary to determine the liability of the defendants, Bioren, Korn and Bunn.

In their brief, the defendants point to the absence in the complaint of any allegation that the defendants induced the activity complained of; and it is asserted that they did not directly or indirectly control Watson's conduct.

The Court disagrees. Section 20 of the Act (15 U.S.C.A. § 78t) deals with the liability of controlling persons. It provides, in pertinent part, that:

"(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

■ It may be possible, upon the trial of this action, for the defendants to prove that they acted in good faith. However, to satisfy the requirement of good faith it is necessary for the defendants to show that some precautionary measures were taken to prevent the injury suffered. No such facts are presented either in the brief or by way of affidavit. It must therefore be assumed, for the purpose of deciding the motion, that they do not exist. Even if they did exist, however, this would merely

raise a question of fact to be determined at the trial of the case.

The practice of engaging in excessive trading for the purpose of producing commissions rather than acting on behalf of one's client is deserving of the severest condemnation. Its very nature brands it as one of the most injurious types of fraud possible. Its perpetrators prey on unwary and inexperienced investor, since it is they who most frequently divest themselves of complete control of their resources and place absolute trust and confidence in their fiduciaries. As the Commission observed in *Behel, Johnsen & Co.*, supra, "such activities represent a particularly vicious and fraudulent course of conduct in violation of the anti-fraud provisions of the Securities Act and Securities Exchange Act."

The Commission has recognized the increasing necessity for careful supervision of office employees who are exposed to the public in a fiduciary relationship, especially "under present conditions of active markets, increased interest in securities by inexperienced customers, and the rapid growth and broadened operations of certain large securities firms. * * * " (*Reynolds & Co.*, supra, at p. 916).

The Commission stated further in *Reynolds* that:

"Customers dealing with a securities firm expect, and are entitled to receive, proper treatment and to be protected against fraud and other misconduct, and they properly rely on the firm to provide this protection. * * *

"In the light of these considerations we are of the opinion that, where the failure of a securities firm and its responsible persons to maintain and diligently enforce a proper system of supervision and internal control results in the perpetration of fraud upon customers or in other conduct in wilful violation of the Securities Act or the Exchange Act, for purposes of applying the sanctions provided under the

securities laws, such failure constitutes participation in such misconduct, and wilful violations are committed not only by the person who performed the misconduct but also by those who did not perform their duty to prevent it." (at p. 917).

See Merrill Lynch, Pierce, Fenner & Beane, 31 S.E.C. 494 (1950) and Hawkins v. Merrill Lynch, Pierce, Fenner & Beane, 85 F.Supp. 104 (W.D.Ark.1949); cf. Paul H. Aschkar & Co. v. Kamen & Co., et al, CCH Fed.Sec.L.Rep. ¶ 91,565 (S.D.Cal.1964).

▆▆▆ In this Court's judgment, such a failure is also sufficient to support an action under Section 10(b) and Rule 10b–5 against the person or persons responsible. A contrary ruling would substantially diminish the protection afforded by Section 20 of the Act, and would amount to an invitation to avoid the burden and responsibility of supervising the activities of one's employees.

▆▆▆ Each provision of the Act must be interpreted in the light of the evil that Congress sought to prevent. Doubtless, considerable injury to the investing public is not only possible but inevitable when a salesman is compensated in direct proportion to the volume of transactions he handles, and his activities go unsupervised. The most effective means for insuring adequate supervision is to impose liability for injury resulting from its absence.

In accordance with the above, the Court rules that no facts have been presented such as would absolve the defendants Bioren, Korn and Bunn from liability under Section 20 of the Act for the conduct of the defendant, Watson.

### STATUTE OF LIMITATIONS

Finally, it is argued that the plaintiffs are barred from bringing their action by the expiration of the statute of limitations contained within Section 29(b) of the Act. (15 U.S.C.A. § 78cc(b)). In substance, that section requires that any action to enforce liability under Section 15(c) (1) of the Act (15 U.S.C.A.

§ 78o(c) (1)), which is directed at brokers and dealers, be brought "within one year after the discovery that such sale or purchase involves such violation and within three years after such violation." The defendants also argue that the periods of limitation contained within Section 9(e) (15 U.S.C.A. § 78i(e)) and Section 18(c) (15 U.S.C.A. § 78r(c)) of the Act similarly restrict the plaintiffs' action.

■ This argument must also be rejected. Sections 9 and 18 of the Act are manifestly unrelated to the factual allegations contained in the complaint before the Court. Section 9 refers to manipulation of security prices, whereas Section 18 is concerned with misleading statements in registration documents. These, therefore, are entitled to no discussion whatever.

Section 15(c) (1), however, is clearly related to the facts presently before the Court. As stated previously, Section 15(c) (1) is directed at brokers and dealers. It forbids the use of any "manipulative or deceptive device or contrivance" by brokers and dealers "to effect any transaction in, or to induce the purchase or sale of, any security * * *" and it defines such devices to include transactions which are excessive in size or frequency in view of the financial resources and character of such account." (17 C.F.R. 240.15c1–7(b) (1964)).

■ Without deciding the question, it may be that the plaintiffs could have brought their action against Bioren, Korn and Bunn under Section 15(c) (1) on the theory that they had indirectly— by failing to adequately supervise Watson—violated that provision. This would, of course, affect the statute of limitations to be applied, since none is prescribed under Section 10(b). See e. g. Montague v. Electronic Corp. of America, 76 F.Supp. 933, 936 (S.D.N.Y.1948); Rosenberg v. Globe Aircraft Corp., 80 F.Supp. 123 (E.D.Pa.1948); but see Osborne v. Mallory, 86 F.Supp. 869 (S.D.N.Y.1949); Acker v. Schulte, 74 F.Supp.

683 (S.D.N.Y.1947); Dauphin Corp. v. Redwall Corp., 201 F.Supp. 466, 469 (D.Del.1962); see also the discussion of this particularly thorny problem in 3 Loss, Securities Regulation 1771–1779, 1783 (2 ed. 1961, Supp. 1962).

However, it does not clearly appear, on the basis of the facts now before the Court, that the plaintiffs ought to have brought their action under Section 15(c) (1). For, although it is alleged in the complaint that the defendant Watson purchased stock which was not listed on any national securities exchange, it does not appear to a certainty that all of the securities transactions involved related solely to non-listed securities. The plaintiffs merely alleged in their complaint that Watson, *inter alia,* "purchased low grade, highly speculative shares of stock for the account whch were not listed on any national securities exchange." (Count I, ¶ 12(d) of the Complaint). This leaves five other subsections which deal specifically with securities transactions which may or may not have been effected on a national exchange. The defendants have not presented any proof which would confine the transactions to non-listed securities, and the Court will not infer it. If, in fact, some of the transactions were effected through an exchange, no action as to those could be brought under Section 15(c) (1) since that section is applicable only to transactions effected otherwise than through an exchange.

Moreover, Section 15(c) (1) applies specifically to brokers and dealers. Watson was a salesman. Further, even if it be assumed that the action ought to have been brought against Bioren, Korn and Bunn under Section 15(c) (1), it is still not entirely clear that the period of limitation therein specified had expired when the action was begun. It will be recalled that the limitation contained in Section 15(c) (1) specifies that the action be brought within one year after discovery of the violation, and within three years after the violation actually occurred.

■ The period specified in the complaint during which the violation is alleged to have occurred continued until April of 1964. The complaint was filed on December 15, 1965, clearly within the three years specified. It may also be possible for the plaintiffs to show that they could not have discovered the violation with reasonable diligence until some time after December 15, 1964. Thus, regardless of the limitation period applied, it cannot now be determined, as a matter of law, that the suit was not timely. If this decision later becomes relevant, the Court will be in a position to make the determination with the assistance of a more complete record.

■ Having determined, for the purpose of deciding the motions before the Court, that the action was properly brought under Section 10(b) and Rule 10b–5, the Court also has jurisdiction over the pendent claims of common law negligence. See Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586 (1933).

Since it has been determined that the facts alleged in the complaint constitute a violation of Section 10(b) and Rule 10b–5 of the Act, giving this Court exclusive jurisdiction, it is now unnecessary to decide the intriguing question whether the alleged violation of exchange rules also gives rise to liability under the Act. See Colonial Realty Corporation v. Bache & Co., 358 F.2d 178 (2nd Cir. 1966); Lowenfels, Implied Liabilities Based Upon Stock Exchange Rules, 66 Colum.L.Rev. 12 (1966); Lowenfels, Private Enforcement in the Over-the-Counter Securities Markets: Implied Liabilities Based on NASD Rules, 51 Cornell L.Q. 633 (1966).

### ORDER

And now, to wit, this 20th day of September, A.D. 1966, in accordance with the foregoing, it is ordered that the motion to dismiss the complaint as to defendant New York Stock Exchange for improper venue is hereby granted; the motion of the defendants Bioren & Co., John C. Korn and John F. Bunn, Jr., partners in Bioren & Co., to dismiss the complaint or, in the alternative, for summary judgment is hereby denied.

And it is so ordered.