**BATH INDUSTRIES, INC., a Delaware corporation, Plaintiff,**

v.

**Emmet J. BLOT, Edward A. Merkle, Madison Fund, Inc., a Delaware corporation, MAD International, Inc., a corporation, Richard E. McConnell, Donner Corporation, a Pennsylvania corporation, Hambro American Bank & Trust Co., a New York corporation, Norton Penturn, Clark Estates, Inc., a corporation, X, Y and Z Investment Companies, and A, B and C Investment Banking and Brokerage Firms, Defendants.**

Civ. A. No. 69-C-453.

United States District Court
E. D. Wisconsin.

Nov. 3, 1969.

**528**

David E. Beckwith and Robert A. Christensen, Milwaukee, Wis., for plaintiff; Michael Mitchell and Joseph Flom, New York City, of counsel.

Maxwell H. Herriott, Laurence C. Hammond, Jr. and W. Stuart Parsons, Milwaukee, Wis., for defendants, Emmet J. Blot and Hambro American Bank & Trust Co.; David Hartfield, Jr., and Paul J. Bschorr, New York City, of counsel.

Frank J. Pelisek and James C. Mallatt, Milwaukee, Wis., for defendants, Edward A. Merkle and Madison Fund, Inc.; Duncan O. McKee and Tyson W. Coughlin, Philadelphia, Pa., of counsel.

Reuben W. Peterson, Milwaukee, Wis., for defendant, MAD International, Inc.

Victor M. Harding, Milwaukee, Wis., for defendant, Clark Estates, Inc.; Winthrop, Stimson, Putnam & Roberts, New York City, of counsel.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY INJUNCTION

REYNOLDS, District Judge.

Bath Industries, Inc., brings this suit for preliminary injunction to prevent defendants from voting the Bath stock they hold, requesting a special shareholders' meeting or a copy of the shareholders' list, and from acquiring any shares of Bath stock or warrants. It is the contention of Bath that defendants failed to comply with section 13(d) of the 1934 Securities Exchange Act (15 U.S.C. § 78m(d)) also referred to as the Williams Act.

Bath more specifically claims that defendants have acted as a "group" within the meaning of 13(d), have become the beneficial owners of more than ten percent of the stock of Bath, and therefore should have filed a 13(d) statement, which defendants admittedly had not done prior to the evidentiary hearing on the motion for preliminary injunction.[1]

To sustain the issuance of a preliminary injunction Bath must make " * * * a showing of probable cause for ultimate relief on the merits." Chicago South Shore & South Bend R.R. v. Monon Railroad, 235 F.Supp. 984, 985 (N.D.Ill. 1964). See also Pan American Sulphur Co. v. Susquehanna Corp., CCH Fed.Sec.L.Rep. § 92,473 (W.D.Texas 1969).

The action was commenced on the 29th day of September, 1969, by filing of plaintiff's complaint and motion for temporary restraining order and for preliminary injunction with supporting affidavits. On September 30, 1969, the Court, being satisfied that the plaintiff had made a showing that it would suffer

---

[1]. Since that time some of the defendants have filed what purport to be 13(d) statements.

irreparable injury unless the defendants were temporarily restrained, issued its order to show cause and temporary restraining order.

On October 3, the defendants Emmet J. Blot and Hambro American Bank & Trust Co. made application to the Court for vacation of the temporary restraining order which was denied.

An evidentiary hearing on the plaintiff's motion for a preliminary injunction was held commencing on October 9, 1969 and concluding on October 17, 1969.[2] At that time the Court stated that it would grant plaintiff's motion for preliminary injunction and that plaintiff's counsel should submit their proposed findings of fact and conclusions of law in accordance with the Court's decision; that the plaintiff had established that it was likely that it would ultimately prevail on its first claim for relief, i. e., that the defendants had violated the Williams Act (Section 13(d) of the Securities Exchange Act of 1934, as amended (15 U.S.C. § 78m(d)); that it would suffer irreparable injury if the defendants were not preliminarily enjoined during the pendency of this action; that pursuant to Rules 65 and 52 of the Federal Rules of Civil Procedure the temporary restraining order would continue in force while the Court prepared its findings of fact and conclusions of law and the order for preliminary injunction; and that the Court hoped to have this completed by October 24, 1969. On Oc-

tober 20, 1969, the defendants Blot and Hambro requested a hearing on the terms of the proposed findings, conclusions, and preliminary injunction, and such a hearing was held on October 27, 1969, at which time the defendants requested that no preliminary injunction be issued because of the fact that the defendants Blot, and Penturn, and the Hambros Bank, Ltd., had in the meantime filed with the SEC statements purporting to set forth the information called for by section 13(d). The plaintiff at this hearing claimed that such filings were legally insufficient to comply with the act in that they contained representations which were false and misleading. All parties agreed that it would now be up to this Court to determine the legal sufficiencies of these filings.

## FINDINGS OF FACT

Plaintiff, Bath Industries, Inc. (hereinafter "Bath"), is a Delaware corporation with its principal place of business and corporate headquarters at 2100 North Mayfair Road, Milwaukee, Wisconsin. Bath consists of a corporate central office in Milwaukee County, Wisconsin, and two principal operating subsidiaries, Bath Iron Works Corporation (hereinafter "BIW"), a company located in Bath, Maine, engaged in shipbuilding, and Congoleum Industries, Inc. (hereinafter "Congoleum"), a company engaged in the business of manufacturing floor coverings, household furnishings and re-

---

2. At the outset of this hearing, the defendants Edward A. Merkle, Madison Fund, Inc., and MAD International, Inc., advised the Court that they had entered into settlement agreements with the plaintiff, copies of which were furnished to the Court, and submitted a stipulation and order of dismissal. The Court specifically refused to approve the settlement agreements, but an order of dismissal was entered. Subsequently, in the proceedings, Clark Estates, Inc., advised that it desired to enter into a settlement agreement with the plaintiff, but this settlement agreement has not been signed. Plaintiff's counsel has also advised the Court that defendants, Richard E. McConnell and Donner Corporation, have requested of the plaintiff that they be "permitted" to settle on the same basis that the defendants Merkle and Madison Fund had settled. The Court has been advised that these settlement agreements have been executed. The Court has declined to sign any further orders of dismissal because of serious doubt as to the legality of these agreements in that they may violate the securities laws and the spirit of the temporary restraining order which was to maintain the status quo. Therefore, the question of dismissal based on these "settlement agreements" and the legality of these agreements will be held in abeyance until the question of whether or not a permanent injunction should issue is determined.

lated products with seventeen plants located in New Jersey and throughout the country. Bath Industries was organized as a holding company in 1967 to hold all of the common stock of BIW and later Congoleum which was acquired in 1968. At its Milwaukee offices Bath has a small staff consisting of its president and chief executive officer, William D. Kyle, Jr. (hereinafter "Kyle"), its executive vice president, Robert Greenwalt, and other personnel whose function it is to furnish to the operating subsidiaries policy and planning guidance, financial support and assistance, operating and engineering assistance, as well as legal and other services.

BIW is the outgrowth of a company which originated before 1900 and has been engaged in the shipbuilding business in Bath, Maine, for more than seventy years. While BIW has some non-military contracts, its principal business for the past thirty years has been the construction of destroyers for the United States Navy. It is one of the nation's principal shipyards engaged in the manufacture of destroyers. Congoleum was acquired by Bath in 1968. It is engaged in the business of manufacturing floor coverings, home furnishings and related items. It has offices in New Jersey and plants in New Jersey and throughout the country.

Defendant Emmet J. Blot (hereinafter "Blot") resides in New York City and is an investor by occupation. Since early 1966, Blot or his investment companies have been substantial stockholders of Bath.

Edward A. Merkle (hereinafter "Merkle") resides in Haworth, New Jersey, and is the president of Madison Fund, Inc., which was also named as a defendant in the complaint. Madison Fund, Inc., is a registered, closed end investment company with its offices in New York City. MAD International, Inc. (hereinafter "MAD"), named as a de-

fendant in the complaint, is a foreign investment company associated with Madison Fund with its offices in Switzerland.

Defendant Richard E. McConnell (hereinafter "McConnell") resides in New Caanan, Connecticut, and is vice president of Donner Corporation, also a defendant, which has its offices in New York City. Donner Corporation (hereinafter "Donner") acts as the investing agent and nominee for the William H. Donner family.

Defendant Hambro American Bank & Trust Co. (hereinafter "Hambro American") is a New York banking corporation with its offices in New York City. It is owned by a holding company, Eurus, Inc., which is in turn owned fifty percent by Hambros Bank, Ltd., (hereinafter "Hambros") a merchant banking corporation, and fifty percent by approximately twenty-five American stockholders, including one of its directors, defendant Blot. Hambros has its principal offices in London, England, and has subsidiary corporations throughout the world.[3]

Defendant Norton Penturn (hereinafter "Penturn") is a stockholder of Bath, residing in Toronto, Canada.

Defendant Clark Estates, Inc. (hereinafter "Clark Estates"), is a corporation that provides investment advice and related services for a group of individuals and charitable institutions collectively referred to as the Clark family, with offices in New York City. It can and does in most instances determine how the shares of stock held by the persons and institutions it represents are voted.

Since 1967, Bath through BIW has been a contender for a very large Department of Defense procurement contract which involves the destroyer requirements of the United States Navy for the next ten years and has been referred to in these proceedings as the "DX Contract." Bath has invested a substantial amount of its own funds as well as fed-

---

3. For an interesting article on the history and operation of Hambros, Ltd., see Joseph Wechberg's profile in the February 5, 1966 issue of the NEW YORKER entitled "An Accepting House," pages 42 to 83.

eral funds (received pursuant to development contracts) to prepare and submit its proposal to the Department of Defense to furnish as many as forty-five new Navy destroyers. The contract, which has a potential gross value in excess of $2 billion, will be awarded to one of the last two contenders, Bath or Litton Industries, in November or December of this year. Bath has been advised that the Navy intends to announce the award of the contract on November 18, although there have been some indications that the announcement date may be delayed for several weeks. The contract is by far the largest that Bath has ever contended for. If Bath is successful in obtaining the contract it will construct an entirely new shipyard, for which plans have been made, more than double its employment force, and be required to obtain a substantial amount of additional capital. Planning for the DX contract has progressed to the point where arrangements have been made with Hughes Aircraft whereby that firm will undertake to perform significant portions of the electronics work necessary to the production of Navy destroyers. The naval architect firm, Gibbs and Cox, has been retained by Bath Iron Works, and arrangements for the financing of the contract are in the process of being finalized with Goldman, Sachs and Co. (hereinafter "Goldman-Sachs"). In addition, the Constitution of the State of Maine has recently been amended so as to allow the state to guarantee, to the extent of thirty two million dollars ($32,000,000), a bond issue for the financing of the shipyard.

Starting in August 1968, Blot expressed his view to the president of Bath and to its Board of Directors that he would like to see the management of Bath headed by a different chief executive officer and the offices of Bath moved to New York City. Blot's views in this respect were not accepted by the Board. With a view to removing Kyle as chief executive officer and accomplishing his purpose, Blot requested another director of Bath, Roger D. Lapham, Jr., to set up a dinner meeting in New York City on April 14, 1969, to be attended by Blot, Kyle, Lapham, Merkle and McConnell. Blot understood that at this meeting Merkle and McConnell would present to Kyle their proposal that they or the corporations which they controlled would purchase Kyle's Bath stock. The dinner meeting was held but no definitive proposal to purchase Kyle's stock was made by Merkle or accepted by Kyle. At some time after the dinner meeting in New York [April 1969] and before midsummer, Blot, Merkle, McConnell and Hambros, acting through one of its managing directors, John Clay, undertook a deliberate, conscious plan to pool their voting interest in Bath stock and to acquire additional shares of Bath stock, and to obtain the support and votes of other large stockholders of Bath, all to the end that they could force the resignation of Kyle or force the Directors of Bath to elect a new chief executive officer of their choosing and move the offices of Bath to New York City. Their plan contemplated that if they were unsuccessful they would demand a special shareholders' meeting of Bath at which time they and the other shareholders who had joined their group would vote their shares to expand the Bath Board of Directors, elect new Directors to the newly created posts who shared their view that the management of Bath should be changed, and with a majority of Directors name a new chief executive officer and move the corporate headquarters to New York City.

The exact date when Blot, Merkle, McConnell and Hambros agreed to pool their voting interests to accomplish their plan cannot be precisely determined, but from the record it appears that the group was formed sometime in the spring or early summer of 1969, as the plan was in operation by midsummer. In addition to Blot, Merkle, McConnell and Hambros, the group also included Penturn, Hambro American, MAD International, the various companies that Merkle and McConnell directed and controlled, and later Clark Estates. Throughout this period

the members of the group owned substantially in excess of ten percent of the outstanding common stock and preferred stock of Bath.

As of March 31, 1969, Bath had issued and outstanding 2,238,708 shares of common stock, 911,332 shares of preferred stock and 488,720 warrants to purchase its common stock. As of September 30, 1969, Bath had issued and outstanding 2,364,168 shares of common stock, 870,465 shares of preferred stock and 488,520 warrants to purchase its common stock. All of these figures are on a post-August 29, 1969 split basis. Each share of Bath preferred stock has one vote but is convertible to common stock on the ratio of 2.43 shares of common for each share of preferred. Each warrant grants to the holder thereof the right to obtain one share of Bath common stock upon the payment of the price stipulated in the warrant. Bath's preferred stock pays a dividend of $2.50. By converting preferred stock a preferred shareholder may increase his voting strength by a factor of 1.43. Between March 31, 1969 and September 30, 1969, Madison Fund and Merkle increased their holdings of Bath preferred and common stock and warrants from 102,486 shares to 288,052 shares (on a fully converted basis—that is, assuming conversion of preferred shares to common shares and exercise of stock warrants). In the same period, that is from March 31, 1969 to September 30, 1969, Hambros increased its holdings of Bath common and preferred shares in substantial amounts. The nominee partnership for Hambros is Daly & Co. in New York City. Daly & Co. is composed of individuals who are officers or are otherwise associated with defendant Hambro American. Hambros and its subsidiaries or affiliates maintain accounts at defendant Hambro American through which transactions in Bath securities were effected. According to the stock records of Bath, the shares of Bath stock (on a fully converted basis) held by Daly & Co. increased from 265,832 shares as of March 31, 1969, to 425,031 shares as of Sep-

tember 30, 1969. The records of Daly & Co. indicate that in this same period the Bath shares held by Hambros and its affiliates increased from 167,500 to 332,490 (on a fully converted basis). It appears from the testimony and exhibits that the Bath stock and warrants held by Hambros are held in their name or the names of their subsidiaries and affiliates; that these shares were purchased at the instance of Hambros and that Hambros votes the stock.

At the meeting of the Bath Board of Directors on August 19, 1969, Bath management advised the Directors, including Blot, that the Navy insisted that if Bath was to remain a contender for the DX Contract it must, prior to November 4, 1969, obtain firm commitments from lending institutions to purchase its common stock and debentures and so advise the Navy. For some months prior to August, the management of Bath had developed, with the assistance of the investment banking firm of Goldman-Sachs a plan to obtain the additional capital that Bath would require for the performance of the DX Contract. Management's dealings wth Goldman-Sachs had, prior to August 1969, been the subject of discussion at Board meetings. Goldman-Sachs had recommended as early as April 1969 to Bath that it issue and privately place up to $25 million worth of its common stock and up to $40 million worth of its debentures. The plan contemplated that the issuance of common stock and debentures was contingent upon Bath being awarded all or a part of the DX Contract. It contemplated that the common stock would be issued shortly after the DX award (if Bath obtained all or part of the award) and the debentures would be issued later. During the August meeting there was extensive discussion with respect to that portion of the plan that related to the issuance of Bath common stock and particularly the formula for determining the price at which the stock would be issued. The pricing formula is still being negotiated by Bath management with Goldman-Sachs. In all events, it

was made clear to Blot and the other directors present at the August meeting that within a short time after the announcement of the DX Contract, which was to be made on November 18, 1969, that Bath would issue up to $25 million worth of new common shares.

The Directors of Bath were advised by the president of BIW this spring that the Navy would announce the award of the DX Contract on November 18. The contract and the date that the Navy contemplated that it would be announced were the subject of extensive discussion by the Directors at each Board meeting, and particularly the Board meetings that took place in the months of June, July and August. There is considerable dispute in the record as to whether Blot and another Bath Director, Milton V. Freeman, a Washington attorney who at various times has acted as Blot's attorney and has been allied with Blot on the Bath Board of Directors, were in favor of, or were opposed to, Bath attempting to obtain the DX Contract. It appears that from time to time Blot questioned the profitability of the contract and that on several occasions, particularly at the August Board meeting, Blot and Freeman questioned the plan, in particular the provisions which contemplated the issuance of a substantial amount of additional common stock, that had been developed by Goldman-Sachs to provide the capital necessary to perform the contract. There is no present evidence that either Blot or Freeman had an alternate plan to raise the necessary capital. Blot and Freeman state that they were and are for the DX Contract but they did very little to aid in obtaining it. Blot, Freeman, Merkle and McConnell knew that the other eleven Directors of Bath strongly favored the DX Contract and that they were greatly concerned that nothing should happen to Bath, its management or its financial plans that would reduce its chances of obtaining the DX Contract.

The plaintiff has alleged that Blot, et al., wanted to spin off the BIW with its low price earnings ratio and concentrate on Congoleum with its high price earnings ratio which would result in an increase in the value of the stock. It is inferred, but not clearly stated, that this spinoff scheme would fail if the BIW got the DX Contract, and, therefore, Blot, et al., were in fact against the DX Contract. This has not been proved and is only mentioned here because of the fact that the reasons given by Blot for getting rid of Kyle may not be the whole reason, i. e., he made a poor impression on investment analysts at a cocktail and dinner party in New York and that the corporate headquarters should be moved to New York.[4] The reasons given for the proposed changes in management are somewhat unconvincing when one considers the increase in the value of the stock and the desire on the part of informed investors to buy Bath stock. However, on the present state of the evidence, this Court is unable to make a legal finding as to what the other reasons, if any, are that Blot has for seeking a change in management.

As indicated above, by the early summer of this year, Blot, Merkle, McConnell, Hambros through John Clay, and Penturn agreed to form a group to pool their voting interests to get control of Bath and to force Kyle to resign as chief executive officer, or if they were unsuccessful in that to cause the Board of Directors of Bath to discharge Kyle as chief executive officer and name a new chief executive officer of the group's choosing, or should that fail to obtain control of the Board of Directors through a special stockholders' meeting which would presumably be preceded by a proxy battle. Clark Estates was asked to lend its support to the group and become a member thereof in August or early September. It agreed to support the group and to vote the Bath stock under its supervision and control at any special

---

4. The Court takes judicial notice of the fact that Wisconsin is the most civilized state in the Union.

stockholders' meeting in favor of the group. The representative of Clark Estates understood that its support for the group and agreement with it were to be kept secret. Sometime prior to September 10, Blot with the assistance of Merkle and Clay of Hambros, put together a list of the shareholders and shares that constituted the group that wished to control Bath and to name its own chief executive officer. The list was reduced to writing by Blot and is Exhibit 3 in this record. On September 10, 1969, Kyle and Lapham met with Blot, Merkle and Clay in New York City. At this meeting Merkle told Kyle and Lapham that the group of which he and Madison Fund were members had control of the corporation and that they wished to have Kyle step down as chief executive officer and name in his place Orville Beal; that in addition they wished to have Roger Blough and Frederick Atkinson elected to the Board of Directors. Kyle and Lapham were furnished with the three-sheet document which listed the members of the group and the shares of preferred and common stock as well as warrants which they held. They were told that the members of the group had recently purchased substantial amounts of Bath securities and were prepared to exercise their warrants and convert their preferred if such was necessary, and that assuming conversion of preferred and exercise of warrants the group had 933,536 shares out of a total of 1,913,895 shares which the group then believed were outstanding assuming full conversion. The figures that were furnished to Kyle and Lapham are on a pre-August 29, 1969 split basis. At about this same time, and in all events prior to September 16, 1969, Blot on behalf of the group retained the services of Georgeson & Company, a proxy soliciting firm in New York City, and Hill and Knowlton, a public relations firm in New York City that specializes in proxy fights, and an attorney in New York City who specializes in proxy contests.

On September 12, Blot wrote to Bath's secretary at the Bath offices in Milwaukee, Wisconsin, and in care of Corporation Trust Company, Wilmington, Delaware, demanding a copy of Bath's shareholder list. On the same day, Blot's attorney wrote to Kyle at the Bath offices in Milwaukee enclosing a letter signed by Blot and Milton Freeman as directors of Bath, dated September 12, 1969, addressed to Kyle and the secretary of Bath at the Bath offices in Milwaukee, Wisconsin, demanding a special shareholders' meeting to be held on November 17, 1969, (the day before the DX Contract was to be announced) at which meeting the Bylaws of the corporation would be amended to increase the number of directors to twenty-three, to elect the ten new directors, to change the quorum requirements and to make it impossible thereafter for the Board of Directors to create new directorships without stockholder consent. At the time these letters were written the Bath Board consisted of thirteen members, eleven of whom had voted to retain Kyle as chief executive officer, plus Blot and Freeman. By adding ten new directors that shared their view, Blot and Freeman would have a majority of twelve of the Board of twenty-three. Also, on September 12, defendant Penturn signed a letter which was not mailed until September 22, addressed to Bath at its corporate headquarters in Milwaukee in which he demanded that a list of its shareholders be turned over to him.

On September 16, 1969, the Board of Bath met in Milwaukee, Wisconsin. Blot had with him a list of the members of his group and the shares which they held identical to the list which had been presented to Kyle and Lapham on September 10. In substance, Blot or Freeman advised the Board that their group had voting control; that they demanded that the Board elect the new chief executive officer which they had selected, Orville Beal, and add three directors to the Board, Messrs. Beal, Blough and Atkinson. They also advised the Board that if their demands were refused they would press their demand for a special stockholders' meeting to be held on November

17. Considerable discussion ensued, particularly relating to the timing of the special stockholders' meeting and the effect of a proxy battle preceding a special stockholders' meeting of Bath in the weeks immediately preceding the Navy's award of the DX Contract. Blot and Freeman were urged to desist in their plan which they refused to do. It was then suggested that the Board meeting be recessed for two weeks in order to explore the possibilities of reaching some accommodation, during which time the Board members agreed not to reveal the situation to the public. The Board meeting was recessed to September 29.

In the ensuing period, efforts to reach an accommodation failed. This action was commenced on the morning of September 29 after Kyle had discussed it with the members of the Board other than Blot and Freeman and was ratified at the meeting of the Board on the afternoon of September 29. Plaintiff filed its motion for temporary restraining order and preliminary injunction the afternoon of the 29th and the Court being satisfied that a temporary restraining order should issue without notice to defendants, issued its order to show cause and temporary restraining order on the afternoon of September 30. The same day, September 30, defendant Penturn, through his Delaware counsel, sent a demand to Bath to turn over its shareholders' list to him so that he could solicit proxies in connection with the special stockholders' meeting requested by defendant Blot, and Freeman, and in the demand stated that he had been advised by defendant Blot "that many warrant holders and preferred stockholders will convert or exercise their warrants in order to vote at the special shareholders' meeting."

## CONCLUSIONS OF LAW

### I. JURISDICTION AND VENUE.

■ Section 27 of the Securities Exchange Act of 1934 (15 U.S.C. § 78aa) provides for jurisdiction and venue for violations of the 1934 Act. Section 27 provides in relevant part:

"The district courts of the United States * * * shall have exclusive jurisdiction of violations of this title or the rules and regulations thereunder, and of all suits in equity and actions at law brought to enforce any liability or duty created by this title or the rules and regulations thereunder. Any criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred. Any suit or action to enforce any liability or duty created by this title or rules and regulations thereunder, or to enjoin any violation of such title or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found."

Thus it is clear that the statute unequivocally gives the district court subject matter jurisdiction in cases where it is alleged that the 1934 Act has been violated.

■■ Under Section 27 of the Act an action may be brought under Section 13(d) in the district (1) where any act or transaction constituting the violation occurred, (2) wherein the defendant is found, (3) where the defendant is an inhabitant, and (4) where it transacts business. It is clear that the plaintiff has not alleged nor does it argue that venue lies on any basis but the first recited above. Defendants argue that the only violation alleged is a failure to comply with Section 13(d), which requires filing a 13(d) statement with the SEC and sending such statement to plaintiff corporation's office in Milwaukee, and that this non-act in Wisconsin is insufficient to support venue in Wisconsin. Defendants rely primarily on Lorenz v. Watson, 258 F.Supp. 724 (E.D.Pa.1966), where it was held that the SEC's alleged

failure to investigate the defendant's background and supervise his activities did not establish venue in a court outside of the district where the SEC is located. The court held that " * * * any omission on the part of the Exchange took place in New York where it conducts its affairs." 258 F.Supp. at 729. Defendants maintain that the failure to send the statement to the corporate headquarters as required by law is a similar non-act that cannot support venue. The court has previously considered *Lorenz, supra,* on a venue issue, Thill Securities Corp. v. New York Stock Exchange, 283 F.Supp. 239, 245–246 (E.D.Wis.1968), and finds the case no more persuasive now. Section 13(d) creates an affirmative duty to file a 13(d) statement with the SEC and to send a 13(d) statement to the issuer's principal executive office. Defendants allege that the only proper venue is in the district where defendants failed to file with the SEC. However, a careful reading of the statute reveals that if venue is proper in the district where the SEC is located, then it must also be proper in the district where the principal executive offices of the issuer corporation are located, and the court so finds.

■ Moreover, it is the opinion of this court that defendants' argument fails to recognize that once the 13(d) statement has not been filed as required by the Act the activities with which the statute deals become themselves illegal. That is, once sufficient stock has been amassed and the act is triggered and the party has not complied with the act by filing, activities in ·furtherance of the plan, if any, of which the stock accumulation was a part are themselves illegal.

It must be determined, then, if there were sufficient of these activities in this district to support venue. From the record, it is clear that defendant Blot made demands to the company's officials in Milwaukee for a special shareholders' meeting, and stockholders' list, and that he made certain demands, concerning the removal of Kyle and Blot's supposed position of voting control, to the Board of Directors at the meeting of the Board in Milwaukee on September 16, 1969.

■■ The court in Townsend Corporation of America v. Davidson, 222 F. Supp. 1 (D. New Jersey 1963) said that " * * * there need be only one act 'of material importance to the consummation of the scheme' within this District to support venue * * *." 222 F.Supp. at 3–4. In the recent case, Puma v. Marriott, 294 F.Supp. 1116 (D.Del.1969), it was held that "All that is required is but one act within the forum district which represents more than an immaterial part of the allegedly illegal events." 294 F.Supp. at 1120. Hooper v. Mountain States Securities Corporation, 282 F.2d 195 (5th Cir. 1960), held that an act as apparently insignificant as a telephone call into a district was sufficient to sustain venue in that district under Section 27. Dauphin Corporation v. Davis, 201 F.Supp. 470 (D. Delaware 1963), held that the filing of a corporate charter and the amendment of the charter of a second corporation, when part of an illegal scheme, were sufficient to support venue under Section 27 in the district where those actions were taken. On the basis of this authority, the court finds that Blot's demand for a special shareholders' meeting and stockholders' list made to the corporate offices in Milwaukee, and the demand for the removal of Kyle as chief executive officer at the Board meeting in Milwaukee, were acts " * * * in furtherance of the unlawful plan * * * committed within the district * * * " Wharton v. Roth, 263 F.Supp. 922 (E.D. New York 1967), and are sufficient to sustain venue. Further, the court finds that venue is proper for those named defendants who were not alleged to have acted in this district. "If the cause of action is properly here, plaintiff may show defendants' association with the unlawful scheme and their participation in it. It is no answer that defendants' participation consisted of acts and transactions outside the territorial jurisdiction of the Court." *Wharton, supra,* 263 F.Supp. at

923. See also *Townsend, supra,* 222 F. Supp. at 3. "Venue under the Exchange Act is proper if one act in furtherance of the unlawful scheme is done in the forum district. This does not require that each defendant perform such an act; sufficient is an act of which all the defendants were the intended beneficiaries * * *." Zorn v. Anderson, 263 F.Supp. 745, 748 (S.D. New York 1966).

## II. WILLIAMS ACT VIOLATION.

■ Blot, Penturn, Hambro American, Merkle, McConnell and the persons and firms listed on Exhibit 3 which include Madison Fund, MAD International, Hambros, Banque de Paris et des Pays Bas constitute a "group" which has acted together for the purpose of acquiring or holding the securities of Bath, as such a group is defined by Section 13(d) (3) of the Williams Act (15 U.S.C. § 78m(d) (3)) and which has beneficially owned, directly or indirectly, more than ten percent of Bath common stock and preferred stock. See 15 U.S.C. § 78m(d) (1); 17 CFR 240, 13d–3. The court concludes that the members of the group agreed to pool their voting interests in Bath securities and to act in concert to carry out their plan to obtain control of the corporation through the election of a new chief executive officer of their choosing and to increase the size of the Board of Directors of Bath. In addition to pooling their voting interests it appears that certain members of the group acquired additional shares of Bath in order further to insure the success of their plan.

■ The court finds that for purposes of the Williams Act Hambros is the beneficial owner, directly or indirectly, of the Bath shares held by Daly & Co. for it or its subsidiaries and affiliates or accounts under its control because the court is satisfied that Hambros has effective voting control over those Bath shares. Section 13d(1) indicates that the Williams Act is to apply to persons who have acquired "directly or indirectly the beneficial ownership" of the issuer's stock. To define "bene-

ficial ownership" in this context it is important to note the language of the House Report on the Williams Act:

"Paragraph (3) of subsection (d) defines 'person' as follows: 'when two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.' This provision would prevent a group of persons who seek to pool their *voting or other interests* in the securities of an issuer from evading the provisions of the statute because no one individual owns more than 10 percent of the securities. * * * This provision is designed to obtain full disclosure of the identity of any person or group obtaining the *benefits of ownership* of securities by reason of any contract, understanding, relationship, agreement or other arrangement." H.R.Rep.No. 1711, 90th Cong., 2d Sess. 8–9 (1968), U.S.Code Cong. & Admin.News 1968, p. 2818 (Emphasis added.)

Thus it is clear from the House Report that one who has the right to determine how the stock is voted has a beneficial interest for the purposes of this Act. Moreover, the basic regulatory thrust of the Act is in the context of struggles for corporate control, and voting control of stock is the only relevant element of beneficial ownership in that context. In addition, the SEC, when discussing Section 16 of the 1934 Act, has said:

"A person also may be regarded as a beneficial owner of securities held in the name of another person if, by reason of any contract, understanding, relationship, agreement or other arrangement he obtains therefrom benefits substantially equivalent to ownership. * * *

"Benefits substantially equivalent to ownership include * * * the ability to exercise a controlling influence over the purchase, sale or voting of such securities." Exchange Act Re-

lease 7739, CCH Fed.Sec.L.Rep. 26,032 (1966).

The court finds this definition of beneficial ownership applicable also to Section 13 situations; and therefore concludes that since Hambros has effective control over how Bath stock is voted, it is the beneficial owner of said stock for purposes of Section 13(d).

 Within ten days after the group described above agreed to act together, they were required pursuant to the Williams Act to send to the offices of Bath in Milwaukee, to the New York Stock Exchange where Bath securities are traded, and to file with the Securities and Exchange Commission a statement containing the information called for by Section 13(d) and the regulations issued pursuant thereto. No. 13D schedule was sent to Bath or the New York Stock Exchange or filed with the Securities and Exchange Commission, prior to the start of these proceedings. The group, including the remaining defendants, therefore violated the Williams Act. Sec. 13 (d) of the 1934 Act, 15 U.S.C. § 78m (d).

The Williams Act [Sec. 13(d)] was designed to provide for disclosure of information to the management of corporations, to stockholders, to the investing public, to the New York Stock Exchange or other exchanges, and to the Securities and Exchange Commission in circumstances such as are present here. The timely and accurate dissemination of such information enables management to carefully and fully evaluate potential changes in control and thus discharge its duty to shareholders in connection with its supervision over the affairs of the company. The Act is also designed to aid stockholders by providing additional and critical information to them and to regulatory agencies, both public and private, prior to the time that proxy statements and other similar proxy information may be required pursuant to other Securities Act regulations, and to provide for timely and full disclosure to the corporation's shareholders and the investing public so that they can make informed investment decisions with knowledge of the material facts concerning the existence of the group, its members, their source of financing and their plans or proposals with respect to the corporation. House Report 3–4, Hearings on H.R. 14475 Before the Subcommittee on Commerce and Finance of the Committee on Interstate and Foreign Commerce, 90th Cong., 2d Sess. 12, 16 (1968); Hearings on S. 510 Before the Subcommittee on Securities of the Senate Comm. on Banking and Currency, 90th Cong. 1st Sess. 43, 70–71, 156 (1967); Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 946 (2d Cir. 1969).

Plaintiff has proved a violation of the Williams Act by the defendants and other members of the "group" and has proved to the satisfaction of the Court that it is likely that the plaintiff will ultimately prevail on its first claim for relief, i. e., that the defendants have violated the Williams Act.

"It still remains, however, to consider the 'balance of hardships' which are involved in granting or denying a preliminary injunction." Electronic Specialty Co. v. International Controls Corp., 296 F.Supp. 462, 469 (S.D. New York 1968). See also Pan American Sulphur, *supra*.

If a preliminary injunction is not granted and defendants proceed with their plan to call a special stockholders' meeting it is very likely that BIW's chances of obtaining a part of the DX Contract will be severely limited. If Bath is in the midst of a strongly contested proxy fight just before the letting of the contract wherein there is dispute over management and the financing of the contract, BIW's chances for obtaining the contract or part of it will at the very least be chilled. If BIW does not receive at least a part of the DX Contract the Court believes that the shipyards, whose main business has historically been ship building for the government, will be permanently and irreparably injured.

Conversely, the injury to defendants by granting a preliminary injunction

does not seem irreparable if the trial of the action on the merits is expedited. If the reasons Blot gives for his actions are true, i. e., he wishes to replace existing management, and he is not intent on destroying BIW's chances for the DX Contract, as he alleges, a delay until a trial on the merits, or until defendants have filed 13(d) statements and it has been determined if they are adequate will not significantly injure defendants.

 The Court concludes that enforcement of Section 13(d) requires the issuance of such restraining order or injunction as is necessary to compel compliance with the Act. "* * * it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose" of full and complete disclosure. J. I. Case v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). See also SEC v. National Securities, Inc., 393 U.S. 453, 463, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969).

Plaintiff has failed to satisfy the Court that it is likely to recover on its second claim for relief: alleged violations by the defendants of Section 14(a) of the 1934 Act (15 U.S.C. § 78n(a)). Plaintiff has not pressed its third and fourth claims for relief and therefore the Court makes no findings with respect to those claims.

As of this date Blot, Penturn, and Hambros Bank, Ltd., have filed with the SEC statements purporting to set forth the information called for by Section 13(d). Plaintiff claims that these filings are legally insufficient in that they are false and misleading. Therefore a determination must be made, as was the case in Pan American Sulphur, *supra*, as to whether these statements are legally sufficient. Until that determination is made, the preliminary injunction hereinafter issued is to remain in effect.

In light of the foregoing, and after much deliberation,

It is ordered that the defendants Blot, Hambro American, Penturn and Clark Estates and all persons controlled by them or in active concert with them, including, but not limited to Hambros Bank, Ltd., are enjoined from proceeding with their plan (including, but not limited to removing the chief executive officer of Bath and calling for a special shareholders' meeting) until they have complied with Section 13(d) of the 1934 Act.

It is further ordered

1. That this preliminary injunction remain in effect until it is determined that the 13(d) statements that have been or will be filed by the defendants are legally sufficient;

2. That plaintiff shall serve a copy of these Findings and Conclusions and this Order for Preliminary Injunction upon Hambros Bank, Ltd., in accordance with Rule 65(d) of the Federal Rules of Civil Procedure;

3. That plaintiff shall give a bond in the sum of Fifty Thousand Dollars ($50,000) for the payment of such costs and damages as may be incurred or suffered by any party who has been found to be wrongfully enjoined by this order.