Helene J. JACKSON et al., Plaintiffs,

v.

BACHE & CO., INC., et al., Defendants.

No. C–70–2254–OJC.

United States District Court,
N. D. California.

June 11, 1974.

74

John J. Ford, III, Carl D. Cammarata, John B. Vlahos, San Francisco, Cal., for plaintiffs.

Douglas M. Schwab, Heller, Ehrman, White & McAuliffe, San Francisco, Ephraim Margolin, Donald S. Zinn, Pillsbury, Madison & Sutro, David L. Cunningham, San Francisco, Cal., for defendants.

## MEMORANDUM FOR JUDGMENT

OLIVER J. CARTER, Chief Judge.

Plaintiffs have brought an action against the defendants wherein they allege violation of the Securities Exchange Act of 1934, fraud, violation of rules promulgated by the New York Stock Exchange and National Association of Securities Dealers, negligence, and breach of fiduciary duties.

Jurisdiction is conferred upon the Court by 15 U.S.C. § 78aa and by the Court's pendant jurisdiction over the state claims.

Stipulated judgments[1] were entered as to defendants Diamond Management,

---

1. At the beginning of the trial plaintiffs attempted to introduce these stipulated judgments into evidence as proof of defendants' violation of rule 10b–5. Plaintiffs argued that the issues resolved by the stipulations were *res judicata* or, alternatively, at least some evidence of wrongdoing. The Court refused to admit the stipulations into evi-

Inc., Donald L. Mitchell, Medical Logistics Inc., Donald P. Reddick and Robert J. Nolan. Kenneth Palmer was not represented at the trial and plaintiffs presented no evidence directly relating to the issue of his liability. Since Palmer played a role significantly different from those of Bache and Burnham, Palmer will be discussed in a separate memorandum. Thus the only defendants actively involved in the trial and affected by this memorandum are Bache & Co., Inc. (Bache) and Burnham & Co., Inc. (Burnham).

## FINDINGS OF FACT

As will be discussed in some detail *infra*, the key issue in resolving the questions presented in this case involves a detailed analysis of the relationships between the various parties connected with the action. Each of the seventeen plaintiffs occupies a unique position in the factual setting of the case and must therefore be treated upon an individual basis; generalizations as to the plaintiffs' conduct vis à vis the defendants can be discussed only after individual characteristics have been isolated. Accordingly, each plaintiff will be treated separately.

It should be noted at this point that there are four "key" plaintiffs—Jackson, Smith, David Peyton, and the Maioranas. These plaintiffs are key in the sense that they typify a particular group of plaintiffs and were active in their involvement with Medical Logistics. The other plaintiffs are sometimes referred to as "peripheral", not to minimize their economic involvement with Medical Logistics, but due primarily to their dependence upon one of the key plaintiffs.

*Helene J. Jackson*

Helene Jackson is a widow and retired secretary who, at the time of her investments in Medical Logistics, was the beneficiary of a trust that was to terminate upon the death of an elderly aunt. She was thus living upon a fixed, limited income.

Jackson had been involved in the stock market for a number of years and had been associated with several brokerage firms. Jackson's relationship with these brokerage houses could hardly be considered passive; she received various stock market periodicals, was generally aware of market conditions, and possessed a considerable amount of knowledge about the investment field. This knowledge was not lost upon her various registered representatives; Jackson discussed recommendations with them, offered her own suggestions, and played an active part in the development of her portfolio.

Jackson's knowledge of the stock market was accentuated by an intelligent and thorough mind—she was careful to review all the papers and documents connected with her stock purchases. She frequently investigated the background of the companies in which she was investing and quite often brought to the attention of her brokers companies that she had discovered.

Jackson began her association with Donald Mitchell in February of 1967 when she transferred her account to Bache from Dean Witter. Jackson had been dissatisfied with her registered representative at Dean Witter and went specifically to Mitchell upon the recommendation of a friend.

Later in 1967 Jackson became dissatisfied with the advice Mitchell was providing and transferred her account from

dence on the grounds that they could not bind those defendants not a party to the stipulations. Binks Manufacturing Co. v. Ransburg Electro-Coating Corp., 281 F.2d 252 (7th Cir. 1960). Thus stripped of any judicial character, the stipulations were only unsworn out of court statements admitting certain facts and thus were hearsay. See Greenberg v. Mobil Oil Corp., 318 F.Supp.

1025 (N.D.Tex.1970); United States v. Standard Oil Co., 60 F.Supp. 807 (S.D.Cal. 1945), reversed on other grounds 153 F.2d 958 (9th Cir. 1946). Plaintiffs were unable to articulate any exception to the hearsay rule that would allow the stipulations to be admitted and the Court thus refused to permit them to be introduced.

Bache to Burnham. In May of 1968, however, Jackson returned to Mitchell and Bache; she stated that she "still trusted the guy" and thought that the previous trouble had been simply a misunderstanding. Additionally, Jackson had not been pleased with her registered representative at Burnham. When Mitchell left Bache to accept a position with Burnham, Jackson followed Mitchell and reactivated her previous Burnham account.

Jackson testified that when she originally consulted Mitchell she outlined her objectives to him; she stated that she was seeking stability and conservative investments that would protect the money she was receiving from the trust. Jackson's actual background in the stock market (at least since 1963), however, indicates a willingness to invest in stocks that were highly speculative. Jackson had lost some money on stocks she knew to be characterized as "flyers" and had a good idea of the risks she was taking. Mr. Sisson, Jackson's post-Mitchell registered representative, characterized his client as an "aggressive" investor.

In 1968, prior to the introduction of Medical Logistics by Mitchell to Jackson, Mitchell described Dayton and Rosegold stocks to Jackson. These were stocks that Mitchell stated were "his own deal" and Jackson invested money in the companies. The stocks were unregistered low price securities (i. e., less than five dollars) and the transactions did not go through Bache or Burnham—Jackson made out the checks to another brokerage house as per Mitchell's instructions. Jackson was aware that Mitchell was, or purported to be, an officer of Dayton and that he had sold some of the stock to his family and owned some himself. Jackson additionally was aware that Bache and Burnham did not deal in such stocks.

Jackson testified that she dealt with Mitchell as she had dealt with all her other brokers; she visited him at his office at Bache approximately once a week and called him regularly on the telephone. It was during one of her regular meetings with Mitchell that Jackson first learned of Medical Logistics. Early in 1969 Jackson, while at Mitchell's desk in the Bache offices, overheard Mitchell discussing Medical Logistics on the telephone. Jackson queried Mitchell about the company and he indicated that it was a corporation that dealt with medical equipment and supplies. Subsequent to this initial introduction Mitchell provided to Jackson brochures and promotional material containing information about Medical Logistics. This information was given to Jackson at Mitchell's desk in the Bache office.

Jackson was interested in Medical Logistics because she believed the medical field to be a good one—she had been employed as a secretary in a hospital and medical environments—and had some knowledge about the field. When she discovered that Dr. David Smith was the medical consultant to Medical Logistics she was very impressed because she had heard of Dr. Smith and his credentials. Mitchell told Jackson that Medical Logistics looked good and Jackson decided to consider the investment further. In July of 1969 Jackson attended a meeting at the Medical Logistics offices. Present at this meeting were Reddick, the president of the corporation, Palmer, the secretary-treasurer, and Mitchell. The purpose of the meeting was to acquaint potential investors with the principals and the company in general. Reddick did most of the talking and Jackson stated that she was "thoroughly impressed with those people [at Medical Logistics] otherwise I would not have invested."

On July 15, 1969 Jackson invested $20,000 in Medical Logistics. In return for this investment she received a note signed by Reddick. This note [2] indicated that the money was a loan and that

2. The note was typical of those received by all plaintiffs. It read: "The undersigned

Donald P. Reddick, offers to satisfy the obligation of a promissary [sic] note to Helene

stock would be issued to repay the loan as soon as the California Commissioner of Corporations gave Medical Logistics permission to issue stock to the general public. Although many of the plaintiffs claimed to be confused by the note and its terms, the note is not ambiguous; none of the plaintiffs were actually receiving stock; the note was in the form of a loan, with stock to be issued at the appropriate time. Jackson understood the terms of the note and the explanations supplied to her by Reddick and Mitchell.

When she invested the money in Medical Logistics, Jackson, as instructed by Mitchell, sent a check directly to Reddick at the Medical Logistics office. The check was made payable to Medical Logistics and made no mention of either Bache or Burnham.

Jackson testified that she based her decision to invest in Medical Logistics upon the brochures that were supplied to her by Mitchell, a list of contracts supposedly held by Medical Logistics, her confidence in the medical field, and her faith in Mitchell as a broker.

Mitchell, while employed at Burnham, told Jackson that he was seeking an underwriting for Medical Logistics. Jackson suggested some names and Mitchell told her that Bache would not underwrite Medical Logistics because it was too small, but Burnham might if someone would match funds.

After investing for the first time in Medical Logistics, Jackson went to an old and trusted friend, a Mr. Dodge, who knew quite a bit about the securities field and asked his advice. Dodge's advice was simple and unequivocal: "Don't touch it." However, Jackson made two subsequent investments in

Medical Logistics, a $5000 investment on October 27, 1969 and a $10,000 investment on March 5, 1970. At least a part of the latter investments appear to be motivated by a desire to pull Medical Logistics out of the deep financial trouble Jackson knew it to be in. She was convinced by the people running the company (*i. e.*, Reddick and Palmer) that the only way to save her original investment was to invest more money to keep the company afloat.

Jackson thus invested a total of $35,000 in Medical Logistics: $20,000 while Mitchell was employed at Burnham, and $15,000 while he was employed at Diamond Management.

Jackson informed several of her friends about Medical Logistics, including plaintiffs Sullivan, Harvey and White, gave them literature, and praised both the company and Mitchell.

Jackson always received a complete record from Burnham of her transactions and would not hesitate to contact the brokerage house if she had a question about those records or had detected an error. Medical Logistics at no time appeared on any Burnham statement or other Burnham document. Jackson was aware that neither Bache nor Burnham dealt in stocks that were not registered and were less than five dollars in value; Jackson knew that Medical Logistics, like Dayton and Rosegold, never went through her Burnham account. Jackson also was aware that Mitchell was receiving a fee for raising money for Medical Logistics and was not receiving his usual commission through the brokerage firm.

*Margaret E. J. White*

White, like her twin sister Helene Jackson, was an intelligent woman,

J. Jackson in the amount of Twenty Two Thousand Five Hundred Dollars ($22,500), dated July 15, 1969 by transfer of four thousand five hundred shares of stock at $1.00 par, in Medical Logistics, Inc. subject to the issuance of this stock, or cash in the amount of $22,500.00 at the maturity of this note.

After the aforsaid [sic] stock is issued to Mrs. Jackson and she desires to sell such stock, she must first offer it for sale at the then market value to Donald P. Reddick. Upon failure of Mr. Reddick to purchase the shares of stock upon this offer Mrs. Jackson shall be free to sell them to any other purchaser.

/s/ Donald P. Reddick"

thoughtful and precise in her manner. However, in investment matters, White frequently followed her sister's advice and tendencies. In 1967 White went with her sister to Mitchell at Bache and remained there until she became extremely dissatisfied with Mitchell. In 1968 she talked her sister into leaving Mitchell and they left Bache to open a new account at Burnham. White claims to have lost over $11,000 while Mitchell was investing her money.

When Jackson returned to Mitchell White refused to follow and maintained a separate Burnham account. White did however invest a total of $35,000 in Medical Logistics. The loan was evidenced by notes similar to those held by Jackson and the investment did not have any connection with White's inactive Burnham account. $20,000 of White's investment was made while Mitchell was employed at Burnham; $15,000 was invested while Mitchell was employed at Diamond Management.

### Vernon Harvey

Vernon Harvey was, at the time the Medical Logistics transactions took place, a personal friend of Helene Jackson. Harvey knew that Jackson had extensive experience in the stock market and he respected her judgment concerning financial matters. Jackson, after she became interested in Medical Logistics, discussed her involvement with the company with Harvey and expressed enthusiasm about the company's prospects. Jackson suggested that Harvey contact Mitchell at Burnham for further information. Harvey had invested in other stocks that Jackson and Mitchell had recommended (e. g., Dayton) and thus was interested when Jackson indicated he should contact Mitchell. Harvey did in fact contact Mitchell and arranged to invest a total of $13,000 in Medical Logistics—$2500 was invested while Mitchell was employed by Burnham, and $10,500 while Mitchell was employed by Diamond Management. At no time did Harvey have an account with either Bache or Burnham. The notes Harvey received were similar to those held by the other plaintiffs; Harvey was advised that the corporate commissioner had not yet given permission to issue stock, but that permission to do so was imminent.

### William A. K. Sullivan

Sullivan was also a personal friend of Jackson and valued her advice on securities. Sullivan considered Jackson to be knowledgeable in the investment field and when she introduced him to Medical Logistics and praised the company, Sullivan became interested. Jackson suggested that Sullivan contact Mitchell and discuss the matter further with him. Sullivan did so and on July 15, 1969, while Mitchell was employed at Burnham, made an investment of $5,000. Sullivan's check was made out to Medical Logistics and was not processed through the channels of either Bache or Burnham. Sullivan never had an account at either Bache or Burnham.

### David Smith, M.D.

Dr. Smith is the founder and medical director of the Haight-Ashbury Free Clinic, a well known medical clinic in San Francisco. He is also on the teaching staff at the University of California Medical Center.

Smith began investing in 1960 and had employed Mitchell as his broker since that date. Smith had been very active in seeking investment schemes; he was a member of a real estate investment club with several other doctors and had been looking for a way to build capital quickly in order to continue with his projects and be relatively independent of financial pressures and considerations. Smith thus has had extensive investment experience, however, he was impulsive and, at the time of the Medical Logistics investment, more interested in a quick gain than in sound planning or careful investigation.

While Smith was in medical school, he believed his investments to be suffering under Mitchell's guidance and he transferred his account from DuPont to

Bache. While at Bache, his registered representative became dissatisfied with Smith as a client and, when Mitchell began his employment at Bache, Smith reestablished his relationship with Mitchell.

In 1967 Smith met Donald Reddick, the president of Medical Logistics; Reddick professed an interest in the clinic and its goals and volunteered to set up management procedures for the clinic. Reddick, Nolan, the vice-president, and Palmer, the treasurer, worked at the clinic as volunteers and Smith went to the Medical Logistics offices in order to purchase medical supplies. While working at the clinic, Reddick and Palmer reorganized patient flow, negotiated a lease, set up an accounting system, and assisted in other financial matters. Smith was impressed with the capabilities of the Medical Logistics people and was pleased with their performance at the clinic.

At a Christmas party in 1967, Smith first discussed the possibility of investing in Medical Logistics with Reddick. Reddick at that time indicated that the company was not then interested in outside investors. Smith believed Medical Logistics to be in a field with good potential and he was anxious to get involved with the company.

Early in 1968 Smith learned that Medical Logistics was seeking additional financing and he made an oral commitment to purchase 15,500 shares at $1 per share. Smith borrowed $5500 in order to make his first payment to Medical Logistics.

Prior to his investment Smith had informed his attorney of the possibility of a Medical Logistics investment and the attorney advised against it because of the company's lack of liquidity. Smith however, brought the matter to the attention of his registered representative, Mitchell, at Bache and asked for his opinion. Smith considered Mitchell to be his financial adviser and was anxious to seek out his opinion of the medical field in general. Mitchell had never

heard of Medical Logistics but told Smith that the health care industry looked good and he would look into Medical Logistics for investment purposes. Mitchell proceeded to discuss Medical Logistics with the company's principals, Reddick and Palmer. Mitchell toured the facilities, checked with the California Commissioner of Corporations, the company's bank, and Dun & Bradstreet. Although the latter three sources supplied little information, Mitchell discovered nothing derogative and became enthusiastic about the company.

Mitchell reported his findings to Smith and Smith indicated that, after borrowing the initial $5500 from Crocker-Citizens Bank on his car, he was unable to obtain any additional financing. Mitchell first attempted to have a finance company, Camden Financial, assist Smith, but Smith was refused the loan. Mitchell next contacted David Peyton, a client and friend with whom he had participated in several financial ventures, in order to arrange a loan for Smith. Peyton was at first hesitant to loan Smith the money, but eventually agreed. In May of 1968 Peyton loaned Smith $10,000 which Smith immediately invested in Medical Logistics. During this time period (May and June of 1968 while Mitchell was with Bache), Smith was attempting to raise as much money as he possibly could in order to take advantage of what he considered to be "the chance of a lifetime to get into a private company that would go public."

Smith's investments in Medical Logistics were evidenced by notes similar to those held by Jackson and the other plaintiffs, indicating that the money was given to Medical Logistics as a loan and was to be converted into stock at such time as the company received permission to issue stock to the public.

Smith became a "consultant" or medical director with Medical Logistics and, although his duties were vague and even his title uncertain, worked on some specific projects and did some work in a field called executive health. Smith's name was also used by the company as a

selling point, although it was not made clear whether this was done with his permission. Smith drew a salary of approximately $500 per month from the company for services rendered from September 1968 to the middle of 1969.

Smith's association with Medical Logistics was similar to that of the other plaintiffs—he made out his checks to Medical Logistics and he never received any confirmation of sale or other mention of the company from either Bache or Burnham.

### Norman J. Sissman, M.D.

Sissman was a friend of Smith's and had worked with him at the Haight-Ashbury Clinic. It was while working at the clinic that Sissman met Reddick and first heard of Medical Logistics. Smith told Sissman that Medical Logistics looked like a good investment and that his broker had recommended it. Sissman at no time met Mitchell or went to the Bache or Burnham offices. Sissman never had an account with either of the two firms and when he made his investment he wrote the check to Medical Logistics and sent it to their office. At no time did he receive any communication from either Bache or Burnham that an investment had been made through their offices.

Sissman's attorney advised against the Medical Logistics investment, however Sissman was anxious to take advantage of the possibility that the company would go public and on September 30, 1968 invested $10,000. The documents evidencing the investment were similar to those obtained by the other plaintiffs —a note signed by Reddick indicating that the money invested was in the form of a loan and was to be repaid in stock when the company was able to issue stock to the public. Sissman took these documents to his attorney and the attorney informed Sissman that he had found nothing irregular about the transaction.

### Roderick G. Snow, M.D.

Snow was another acquaintance of Smith's and, like Sissman, was introduced to Medical Logistics by Smith and received enthusiastic reports about the company. Snow believed Smith to be the medical director of Medical Logistics and, at Smith's urging, went to the Medical Logistics offices to talk with Reddick and Palmer. Snow had never met Mitchell, never had an account with either Bache or Burnham, and never even went to the Bache or Burnham offices.

Snow had participated with Smith in another unsuccessful financial venture, however, on August 29, 1968 Snow made an investment in Medical Logistics of $10,000. The check was made out to Medical Logistics and the note Snow received in return was similar to the notes held by the other plaintiffs.

### David Peyton

Peyton had known Mitchell since 1959 and was a longtime friend and customer. In May of 1968 Mitchell called Peyton in order to arrange a loan between Peyton and Smith. Peyton was impressed with both Smith's credentials and his enthusiasm for Medical Logistics, but told Mitchell that he did not want to make a personal loan. He did tell Mitchell, however, that he was interested in investing in Medical Logistics himself and Mitchell informed Peyton that an opportunity to invest in the company possibly existed.

In June of 1968 Peyton met with Reddick, Palmer, Mitchell and Smith at the Medical Logistics offices. At that time Peyton, utilizing Smith's desperate need for a loan as leverage to promote his own introduction to Medical Logistics, reversed his original decision and loaned Smith the $10,000 and additionally delivered a check to Medical Logistics which represented his own investment. Peyton received a note similar to those held by the other plaintiffs and an option to acquire an additional 20,000 shares at $1 per share.

Peyton possessed at the time of the Medical Logistics investments an extensive background in the stock market. Evident in that background is a tendency to invest in highly speculative type

stocks that have a very rapid growth potential. Peyton had in fact made one "killing" in the market in which he had made a great deal of money through advice he had received from Mitchell.

Peyton had had an account at Bache since 1963, however, none of the Medical Logistics transactions appeared on any statement or document connected with Bache or Burnham. This came as no surprise to Peyton; he had been involved in a series of outside investments unassociated with Bache or any other brokerage house. A number of these arrangements had been in conjunction with Mitchell—for example, Peyton had been involved with an oil and gas partnership that had been arranged by Mitchell.

Peyton testified that he knew little about the medical field and relied and trusted Mitchell's judgment. Peyton was aware that Mitchell was receiving a finder's fee for selling the Medical Logistics stock, but invested a total of $95,500 in the corporation. $25,000 of the money was invested while Mitchell was employed at Bache, $49,500 while he was at Burnham, and $21,000 while he was at Diamond Management.

When it was evident that Medical Logistics was undergoing severe financial difficulties, Peyton pumped more money into the company to help keep it alive. He also loaned the company $1,500 in June of 1970 for an audit. In July of that year Peyton learned that Reddick had some sort of criminal record and he contacted an attorney to look into the Medical Logistics situation.

### George Sim

Sim, at the time of the Medical Logistics investments, was a co-worker with David Peyton at Western Electric. Sim was aware of Peyton's achievements in the stock market and occasionally discussed the market and market conditions with Peyton. In one of those discussions Peyton asked Sim if he would be interested in investing in Medical Logistics. Sim replied that he was interested

and in October of 1969 Sim met with Mitchell at the Medical Logistics offices. Also present at this meeting were Reddick, Palmer, David Peyton, and Peyton's parents.

Reddick did most of the talking at the meeting and discussed the company and its objectives. Sim understood Mitchell to be handling the underwriting aspect of the company and was aware that he worked for some prestigious stock brokerage house. Sim also was aware that Mitchell was receiving a finder's fee for selling Medical Logistics stock. However, at the time Sim made his investment, he did not know where Mitchell worked and he did not consider it important to remember where Mitchell worked; the only other facts of which Sim was aware were that Mitchell was Peyton's stock broker and had some connection with Medical Logistics. Except for the investment meetings, Sim had only three or four telephone conversations with Mitchell.

Sim invested a total of $74,000 in Medical Logistics—$15,000 while Mitchell was employed at Bache, $36,000 while Mitchell was employed at Burnham, and $23,000 while he was employed at Diamond Management. Sim never had an account at either Bache or Burnham; he made his checks out to Medical Logistics and at no time received any confirmation from Bache or Burnham that the stock purchase went through their offices.

### Benton Newnum

Newnum, like Sim, was a co-worker with David Peyton at Western Electric. Newnum heard at work that Peyton and Sim had invested in Medical Logistics and he too became interested. After discussing the matter with Peyton and Sim, he called Medical Logistics at their offices and inquired about the investment possibility. In November of 1969 Sim met with Reddick and Palmer at the Medical Logistics offices and they discussed the background of the officers and the corporation. Newnum had, however, made out his check prior to the

meeting and gave it to Reddick at the end of the meeting.

The only knowledge that Newnum had of Mitchell was that he worked for some large brokerage house, that he was involved in some capacity with Medical Logistics, and that he was Peyton's broker.

Newnum had already made his first investment in Medical Logistics when he first talked to Mitchell. Newnum thus had no contact with Mitchell until January of 1970 at which time Mitchell was working for Diamond Management. The primary source of information regarding Medical Logistics was David Peyton, and, despite his wife's opposition to the investment, Newnum invested $16,700 in two investments, both occurring while Mitchell was employed at Diamond Management.

*Ruth Newnum*

Ruth Newnum is married to Benton Newnum and was originally opposed to the Medical Logistics investment. She relented to her husband's determination to make the investment, however, and along with Benton sunk $16,700 into the company. Neither Benton nor Ruth Newnum had an account at either Bache or Burnham and neither received any confirmation about the purchase of Medical Logistics from the brokerage houses.

*Roy and Jean Peyton*

Roy and Jean Peyton are the parents of David Peyton. Roy Peyton is a retired minister of the Gospel. It was from their son that the Peytons first learned of Medical Logistics. The Peytons have a long history of investing experience with a variety of registered representatives and brokerage houses; some of the investments were definitely of a speculative nature.

After having discussed Medical Logistics with their son, the Peytons attended the October meeting at Medical Logistics in 1968. Mitchell was present at this meeting, but appeared to have little influence on the Peytons' decision to invest.

Mitchell had been the Peytons' broker at Bache, but they left in 1966 because of their dissatisfaction with him. At the time of their investment in Medical Logistics, their account was not at either Bache or Burnham.

At the October meeting Reddick and Palmer were present and Reddick presented most of the information about Medical Logistics. Although Mitchell was present and the Peytons were aware that he would play "some sort of role" in the company, they were not certain as to what the role was to be and the position of the brokerage houses Mitchell worked for was not clarified. The Peytons received most of their information about Medical Logistics from their son who spoke of the company in glowing terms; their only contact with Mitchell was at the investment meeting.

The Peytons invested $15,000 in Medical Logistics—$10,000 while Mitchell was employed at Bache, and $5,000 while he was employed at Burnham. The Peytons received no confirmation from either brokerage house that they were in any way connected with the Medical Logistics transactions; and they received the same notes stating that stock would be issued when the company received permission to do so.

*James Arthur Pope*

Pope is the half-brother of Reddick, the president of Medical Logistics. Pope was employed part time at Medical Logistics as a draftsman from April 1969 to June 1970 and worked for a short time in 1968. Pope was never introduced to Mitchell, did not know him, and never discussed an investment with him. Pope knew little about the Medical Logistics business, however, he was told that the company would be underwritten by a large brokerage firm and that the stock would go public. Pope received this information, not from Mitchell, but from Reddick.

Pope had lived with Reddick for some time and his half-brother had a great

deal of influence upon him. Pope knew only that Mitchell played some role in financing Medical Logistics; Pope never had an account at either Bache or Burnham.

Pope's total investment with Medical Logistics was $5,000 and was made during the time Mitchell was employed at Bache. The money was sent directly to Medical Logistics and did not go through either Bache or Burnham.

*Vincent J. and Janet M. Maiorana*

Mitchell had been the Maioranas' broker in 1959 when they made their first stock purchase. Mitchell had been the only broker they ever had and had on several occasions recommended a few highly speculative stocks. The Maioranas, however, did not have an account with either Bache or Burnham and relied upon Mitchell mainly in his capacity as a friend. The Maioranas were never sure where Mitchell worked at any given time (although Mrs. Maiorana did call Mitchell at Burnham on occasion) and when the Maioranas decided to invest, Mitchell called them on the phone and came to their house to pick up the check. The check was made payable to Medical Logistics; the Maioranas never received any confirmation from either Bache or Burnham regarding the Medical Logistics purchase.

The Maiorana investment was of $10,000 on March 2, 1970 while Mitchell was employed at Diamond Management.

*Medical Logistics*

Medical Logistics, Inc. was originally known as Medico Electronics and was taken over by Donald Reddick and renamed in January of 1968. In March of 1968 Medical Logistics was incorporated with Reddick, Palmer and Nolan as the initial incorporators. The company's offices were located in San Francisco and consisted of a fairly elaborate showroom with displays, offices, and storage areas.

Reddick was the president of the corporation; Nolan was the vice-president; and Palmer was the secretary-treasurer. Nolan's role in the company was never clarified at the trial; he apparently had some criminal involvement with drug related offenses as a juvenile, although the plaintiffs dealt more with rumor and innuendo at the trial than actual fact. Reddick also had some sort of criminal record—a conviction connected with his alleged homosexual tendencies. The only principal about whom the plaintiffs presented a significant amount of evidence was Palmer, the secretary-treasurer. Palmer accepted the Medical Logistics job after investigating the company and considering it to be a good opportunity. Palmer left a good job as a staff consultant with a respectable firm of management consultants to assume the Medical Logistics position. Palmer testified that there existed nothing "shady" about Medical Logistics and everything was done in a proper and businesslike fashion. Palmer also testified that he believed Mitchell to be working for Bache and Burnham through Medical Logistics and he saw nothing secretive about the manner in which the investments were handled.

Medical Logistics had an agreement to pay Mitchell a 10% finder's fee. It was not made clear at trial exactly how much Mitchell actually received as compensation for finding investors, however, he did receive a considerable amount of both cash and notes convertible into Medical Logistics stock.

An original 175,000 shares were issued by the corporation; all of it was held by Reddick and it was not authorized for public issuance. This fact was made known to all the plaintiffs and, despite testimony to the contrary by individual plaintiffs, all investors were well aware that they were not receiving stock at the time of the investment, but were making loans to the company and, at such time as Reddick received permission to make the stock available to the public, the loan would be converted into stock.

The investments in Medical Logistics were made by the plaintiffs over a two year period from May 1969 through June 1970. During this period Mitchell

was associated with Medical Logistics in a capacity as a financial adviser, and later was also on the Board of Directors. Mitchell considered his Medical Logistics role to be separate from his positions at Bache and Burnham and he claims to have informed the plaintiffs of that fact. This claim is substantiated by Mr. Sonnenburg's testimony; Sonnenburg was an investor in Medical Logistics and a friend of Mitchell's and he stated that he had no impression that he was dealing with Bache or Burnham and he realized the risk involved in the Medical Logistics investments.

Mitchell was employed by Burnham from February to September of 1969 and was employed by Bache from April 1963 to January of 1969. Upon leaving Burnham, Mitchell was employed by Diamond Management.

The actual information the plaintiffs produced at the trial about Medical Logistics was very sketchy. Medical Logistics was closed down and its assets sold in September of 1970 in order to satisfy the claims of the Internal Revenue Service. There was testimony that a number of the contracts that the company claimed to have did not exist. Yet, the complete financial records and internal operations of the company remained a secret throughout the trial. Thus, as will be discussed *infra*, evaluation of Medical Logistics and its principals is very difficult because the information about the company and the people who ran it is so scarce.

*Bache and Burnham*

Bache and Burnham are both large and reasonably prestigious brokerage houses. The firms deal only with registered securities that are greater than five dollars in value. The firms will, however, sell other "low price" securities out of a client's portfolio and, in fact, encouraged their registered representatives to do so.

The two companies used similar methods of supervising their employees. These procedures included: prohibition against purchase of securities that were less than five dollars per share; daily review by office management of all accounts; periodic review of customer account activity; review and initialing of all outgoing correspondence; weekly meetings with all registered representatives to review and discuss rules; periodic review of monthly customer statements; periodic review of customer books; logging of all customer transactions; daily transmission to home office of all trades; daily review of wire traffic; daily review of check disbursements; maintenance and review of daily blotter.

While at Bache, Mitchell's phone calls were not monitored and his incoming mail was not reviewed. The normal mail procedure was to open any letters addressed to Bache. If the mail was addressed to a registered representative, it was sent to his desk unopened. If the registered representative was not in the office by 9:30 a. m., the mail was opened by the manager.

At Burnham, mail addressed to a particular individual representative was opened and examined for securities and checks and then sent to representative's desk unread. Burnham did not monitor the telephone calls of its employees.

While Mitchell was at Bache, he was a member of an "enrichment" program that was designed to improve the production of registered representatives whose output was considered to be low. This program consisted of close observation and assistance by Sidney Bloom, an assistant vice-president and registered representative at Bache. Mitchell was required to fill out "call sheets" in which telephone calls he was making during the day were to be listed. Bloom discussed the calls with Mitchell but made no effort to monitor all the calls and was aware of the content of conversations only when he accidentally overheard them while at Mitchell's desk. Bloom also reviewed Mitchell's books, his clients, and the stocks he was selling as recorded on the books of Bache. As far as Bloom was aware Mitchell was selling only Bache recommended stocks and

Bloom knew nothing about Medical Logistics.

Mitchell did approach Victor Rosasco, the manager of Bache, with the possibility of underwriting Medical Logistics. This was the first and only time Rosasco heard of Medical Logistics, and he immediately dismissed the possibility by saying that Medical Logistics was too small for Bache to even consider. The fact that a registered representative would approach the manager about an underwriting was not an unusual occurrence and was not sufficient to give the brokerage house notice that the registered representative was selling stock on his own.

After Mitchell transferred to Burnham in 1969, he approached the Burnham manager with his underwriting proposal as well. Mitchell described the company in writing and also noted that he had invested some money in Medical Logistics. The proposal was quickly rejected by Burnham because the company was too small. Burnham's manager testified that such a presentation by a registered representative was not uncommon or suspicious. There existed no other knowledge by the management at either Bache or Burnham of Medical Logistics or the extent of Mitchell's involvement.

## CONCLUSIONS OF LAW

### RULE 10b–5 CLAIM

The principal focus of the plaintiffs' case has been centered upon liability for Mitchell's alleged violations of Rule 10b–5. The factual issues and the legal authorities applicable to the 10b–5 question are in large part determinative of plaintiffs' peripheral claims as well. The Court thus considers it necessary to examine the 10b–5 issue in some detail.

Rule 10b–5,[3] promulgated pursuant to Section 10(b) of the 1934 Securities Exchange Act (15 U.S.C. § 78j(b)), has been an important catalyst in expanding the frontiers of securities regulation. Designed to protect against deceitful conduct in investment practices, Rule 10b–5 has been utilized to inject some degree of bargaining equality into the purchase and sale of securities. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968). The Ninth Circuit, striving to maintain the flexibility deemed essential to the proper functioning of the rule, has eschewed enunciating any uniform standards regarding the elements necessary to establish a 10b–5 violation. White v. Abrams, 495 F.2d 724 (9th Cir. 1974).

The two 10b–5 elements that have been outlined are thus rather broad: (a) the use or employment of any manipulative or deceptive device which incorporates a communication of a material misstatement or an omission of a material fact; and (b) which communication was made in connection with the purchase or sale of any security. Royal Air Properties, Inc. v. Smith, 312 F.2d 210, 212 (9th Cir. 1962); Ellis v. Carter, 291 F.2d 270, 274 (9th Cir. 1961); Matheson v. Armbrust, 284 F.2d 670, 673 (9th Cir. 1960).

That the transactions between Mitchell and the plaintiffs involved the purchase or sale of securities is not in dispute.[4] The Court is thus concerned

---

3. Rule 10b–5 reads as follows:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

4. The notes evidencing the "loan" between the plaintiffs and Medical Logistics establish a "contract, transaction or scheme whereby a person invests his money in a common en-

only with Mitchell's use of a manipulative device and the resultant liability therefor. This issue breaks down into two components: (1) does Mitchell's conduct constitute a violation of Rule 10b–5?, and (2) by what standards are the defendant brokerage houses Burnham and Bache to be held secondarily liable for Mitchell's acts?

### (1) *Examination of Mitchell's Conduct*

Although the plaintiffs have failed to specify those acts alleged to have violated Rule 10b–5, the Court, after hearing the evidence relating to Mitchell's conduct, has determined that there exists two general categories of arguably wrongful acts. Each of these areas relates to Mitchell's alleged recommendation to the plaintiffs that they invest in Medical Logistics.

The first category concerns Mitchell's statements to some of the plaintiffs that he had investigated Medical Logistics and that its potential was favorable. The plaintiffs argue that Mitchell's statements concerning Medical Logistics were in fact untrue—*i. e.*, that in reality the company was financially unsound, that the principals were incompetent and had criminal records, and that the contracts the company held were in fact shams. It is the plaintiffs' contention that, had they been aware of the true nature of Medical Logistics, they would not have invested and they were thus victimized by Mitchell's false statements and omissions of material facts.

The second category of wrongful conduct concerns Mitchell's statements to the plaintiffs regarding the role the brokerage houses were to play in the development of Medical Logistics. The plaintiffs maintain that Mitchell informed them, or led them to believe, that the investments were being handled through either Bache or Burnham and that the brokerage houses would underwrite Med-

ical Logistics at some future date. Such statements, plaintiffs contend, were false and misleading and thus violative of Rule 10b–5.

The key issue in determining the wrongfulness of Mitchell's conduct concerns the extent of the duty owed by Mitchell to the plaintiffs. The Ninth Circuit has recently adopted what was characterized as the "flexible duty standard." *White v. Abrams, supra.* Prior to this decision there existed confusion as to the necessity of demonstrating some type of scienter (*i. e.*, conduct approaching fraud) in order to establish a 10b–5 violation. Cases from other circuits have indicated that a showing of negligence was sufficient to support a finding of liability for 10b–5. See, *e. g.*, Parrent v. Midwest Rug Mills, Inc., 455 F.2d 123 (7th Cir. 1972); Myzel v. Fields, 386 F.2d 718, 735 (8th Cir. 1967), cert. denied 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1967). In *White* the court specifically rejected "compartmentalization" of 10b–5 and urged a departure from traditional fault concepts. The rationale underlying the *White* decision was predicated upon the assumption that a single standard could not adequately satisfy the goals of 10b–5 while a flexible standard permitting courts to deal with the varied factual contexts was necessary. The *White* court left no doubt as to the type of standard to be employed: ". . . we reject scienter or any other discussion of state of mind as a necessary and separate element of a 10b–5 action. The proper standard to be applied is the extent of the duty that rule 10b–5 imposes on this particular defendant. In making this determination the court should focus on the goals of the securities fraud legislation by considering a number of factors that have been found to be significant in securities transactions." White v. Abrams, *supra.*

---

terprise and is led to expect profits solely from the efforts of the promoter or a third party" and thus satisfy the Securities Exchange Act's definition of a security. SEC v. W. J. Howey Co., 328 U.S. 293, 298–299,

66 S.Ct. 1100, 90 L.Ed. 1244 (1946). See also SEC v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476 (9th Cir. 1973), cert. denied 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).

While stressing that the trial court is not to be limited in making "additions or adaptations in a particular case," the *White* court indicated several factors involved in the application of the flexible duty standard: (a) relationship of the defendant to the plaintiff; (b) defendant's access to information as compared to plaintiff's access; (c) benefit defendant derives from the relationship; (d) defendant's awareness of whether the plaintiff was relying upon their relationship in making his investment decisions; (e) defendant's activity in initiating the securities transactions in question. To these factors articulated in *White*, the Court would add: (f) the relationship between the plaintiffs and Mitchell; and (g) the relationship between Mitchell and the defendant brokerage houses.[5]

The issue of the extent of the defendants' duty to the plaintiffs is of crucial importance in the instant case because the plaintiffs have failed to provide any evidence of fraud by either Mitchell or Bache and Burnham. Mitchell believed Medical Logistics to be a growing, viable company.[6] Plaintiffs have additionally failed to demonstrate that Mitchell was attempting to utilize his position at either Bache or Burnham in such a manner as to operate some type of fraud

upon the plaintiffs. As will be discussed below, most of the plaintiffs were either not concerned or not aware that Mitchell worked for the brokerage houses and those plaintiffs who were harboring such illusions held beliefs that can only be considered as unreasonable.

The examination of Mitchell's conduct will thus primarily involve his alleged failure to adequately investigate Medical Logistics. The malleability of the flexible duty standard appears to be maximized in such a case; "[u]nder this standard the duty to investigate and disclose material facts will . . . vary according to the fact situation." White v. Abrams, *supra*. Accordingly, the Court will discuss each of the various factors mentioned above within a rather detailed factual context.

(a) *Relationship between plaintiffs and Mitchell*

▮ Mitchell's exposure to certain of the plaintiffs was virtually non-existent and the role played by the registered repesentative in the investment decision insignificant. With these plaintiffs who had such little contact with Mitchell the issue becomes one of reliance.[7] The best discussion of the reliance element as it applies to 10b–5 is contained in List v.

---

5. Although the relationship between Mitchell and the other parties to the case could be subsumed within the discussion of the relationship between the plaintiffs and the defendants, the fact that any wrongful acts were performed, not by the defendants but by Mitchell, makes separate analysis of Mitchell's conduct imperative.

6. Mitchell accepted at least a portion of his finder's fee in Medical Logistics stock. He brought the company to the attention of the management at both Bache and Burnham in the underwriting context—knowing very well that if Medical Logistics was going to be seriously considered for underwriting it would be subjected to an extensive investigation. Mitchell's acts were thus not consistent with those of a man attempting to sell stock in a fraudulent corporation. Plaintiffs additionally allege that Mitchell was aware of the principals' background and the non-existence of certain contracts; yet no proof was presented at trial to show that Mitchell had such knowledge.

7. Courts often characterize the reliance question in terms of materiality and proximate cause as well. Reliance relates to whether the misrepresentation is a substantial factor in determining the aggrieved party's conduct. Materiality concerns whether a reasonable man would attach importance to the fact misrepresented. See List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965). Considerations as to reliance, materiality, and causation must necessarily be included within those factors appropriate to determination of the flexible duty standard. To avoid these elements would result in the adoption of a strict liability stand and a rejection of the flexibility deemed so important in White v. Abrams, *supra*. See Hecht v. Harris, Upham & Co., 430 F.2d 1202 (9th Cir. 1970); Royal Air Properties, Inc. v. Smith, 333 F.2d 568 (9th Cir. 1964) for previous Ninth Circuit decisions involving the reliance question.

Fashion Park, Inc., 340 F.2d 457 (2d Cir. 1965): "[t]his interpretation of Rule 10b–5 [establishing a reliance standard] is a reasonable one, for the aim of the rule is cases such as this is to qualify . . . the doctrine of *caveat emptor*—not to establish a scheme of investors' insurance . . . The proper test is whether the plaintiff would have been influenced to act differently than he did act if the defendant had disclosed to him the undisclosed fact." List v. Fashion Park, Inc., *supra*, at 463.

Applying the *List* test to the facts in the instant case, the Court can find no relationship running from certain plaintiffs to the alleged wrongful acts of Mitchell—these plaintiffs would not have acted differently had Mitchell not been involved.

Doctors Sissman and Snow never met Mitchell; their sole connection with Medical Logistics was through Dr. Smith. Although plaintiffs argue that Sissman and Snow were impressed with the fact that Mitchell was Smith's financial advisor, it was Smith's enthusiasm for Medical Logistics, not Mitchell's allegedly reassuring presence in the background, that resulted in the investments.

A similar relationship (or nonrelationship) existed between Mitchell and plaintiffs White, Harvey, and Sullivan. Although these plaintiffs had some contact with Mitchell, it was their association with Helene Jackson that was the crucial factor in their decision to invest. These plaintiffs placed their faith, not in Mitchell, but in Jackson. White, for example, had uncategorically rejected Mitchell's assistance and had, prior to the Medical Logistics investment, hired a different broker because of the poor advice Mitchell was providing. Sullivan and Harvey greatly valued Jackson's advice concerning securities and considered her to be an expert in the field. Their meetings with Mitchell regarding Medical Logistics were largely a formality after Jackson's recommendation that they invest.

Pope, Reddick's half-brother, never met Mitchell and was unaware of the exact nature of Mitchell's relationship to Medical Logistics. Pope depended totally upon Reddick for all information concerning the company that Reddick controlled. To allow Pope to recover against Mitchell would stretch 10b–5 beyond recognition.

The relationship between Mitchell and plaintiffs Ruth and Benton Newnum, Roy and Jean Peyton, and George Sim is, at best, tenuous. The Newnums learned of Medical Logistics through co-workers at Benton Newnum's place of employment and investigated the possibility of investment, not by contacting Mitchell, but by calling Palmer directly at the Medical Logistics office. The Newnums had already made their first investment in the company before they had even met Mitchell. Except for an occasional telephone call, the Newnums were not in contact with Mitchell (they were even uncertain as to where he was employed) and their primary source of information and advice regarding Medical Logistics was through Mr. Newnum's co-worker David Peyton. Benton Newnum was aware of Peyton's past successes in the stock market and was dependent upon his co-worker's judgment. Ruth Newnum, although opposed to the Medical Logistics investment, deferred to her husband's decision.

Roy and Jean Peyton were influenced, not by Mitchell, but by their own son David. David Peyton had provided his parents with investment information on several previous occasions and was a key figure in the Peytons' rather extensive investment history. The Peytons had made their decision to invest in Medical Logistics before they had met or discussed the matter with Mitchell. When the Peytons wanted information about Medical Logistics they phoned Reddick or Palmer at Medical Logistics offices, not Mitchell at Bache or Burnham. The Peytons' lack of reliance upon Mitchell is not surprising—like White, they had previously been clients of Mitchell's at

Bache and had left because of dissatisfaction with the way he was handling their account.

George Sim, another one of David Peyton's co-workers at Western Electric, knew only that Mitchell was Peyton's broker and had only three or four phone conversations with Mitchell. Sim's decision to invest was thus motivated, not by any representation from Mitchell, but through his contact with David Peyton. As was typical of Sim's relationship with Mitchell, when he decided to make a second investment in Medical Logistics he wrote, not to Mitchell, but directly to Palmer at the Medical Logistics offices. Mitchell's presence and representations to Sim were essentially irrelevancies in the Medical Logistics investment scheme.

Thus the only plaintiffs who could even arguably be considered to have relied upon Mitchell's alleged misrepresentations are Jackson, Smith, David Peyton, and the Maioranas. It is with these plaintiffs that the fundamental question concerning Mitchell's failure to investigate the background of Medical Logistics must be confronted. The duty under 10b-5 extending to these plaintiffs can best be determined through an examination of the relationship between Mitchell and the defendant brokerage houses.

(b) *Relationship between Mitchell and Bache and Burnham.*

As discussed above, liability for Mitchell's wrongful acts must be predicated upon Mitchell's failure to adequately investigate the company he was recommending. Mitchell's duty to the plaintiffs, however, must be viewed from two vantage points—from that of Mitchell as a private individual and Mitchell in his capacity as a registered representative working for a large and respected brokerage house.

If Mitchell was properly utilizing his status as a registered representative, or the plaintiffs reasonably believed him to be so doing, a different perspective must be afforded the evidence.[8] Backed by the extensive research facilities available to the brokerage houses, Mitchell could be expected to provide the plaintiffs with very high quality, sound advice; the plaintiffs could rely upon his integrity as a company representative. Mitchell as an individual, albeit knowledgeable in market activities, would be held to a much lower standard of investigation since he would lack the resources and prestige supplied by the brokerage houses. *Cf.* White v. Abrams, *supra.*

The plaintiffs, however, knew or should have known that Bache and Burnham were not in any way involved in the Medical Logistics transactions. Helene Jackson had been working with the purchase and sale of securities for many years. She had dealt with several brokerage firms and knew when a transaction was being handled through the house and when it was not. *Cf.* Hecht v. Harris, Upham & Co., 283 F.Supp. 417, 429 (N.D.Cal.1968) aff'd in part, rev'd in part on other grounds 430 F.2d 1202 (9th Cir. 1970). As with all the plaintiffs in this action, there appeared no mention of Medical Logistics in Jackson's account or correspondence with Bache and Burnham. Jackson made payable her checks for the Medical Logistics investments, not to Bache or Burnham, but to Medical Logistics and she was aware that these checks were not processed through the house channels. Jackson knew that Mitchell had previously been involved in matters that were "his own deal" (*i. e.*, Rosegold and Dayton) and Jackson's own testimony indicated that she was aware that the Medical Logistics investments were not being handled through Bache or Burn-

8. This issue is not the same as the respondeat superior issue discussed *infra.* The above discussion concerns Mitchell's role vis à vis the brokerage houses only as it pertains to the creation of a duty under 10b-5.

The secondary liability issue based upon the ostensible authority segment of respondeat superior can be addressed only after a determination of the duty.

ham. It is thus unreasonable to conclude that Jackson was depending in any way upon either the resources of the brokerage houses or the prestige supposedly attaching to Mitchell's recommendations. The logical conclusion to be drawn from the evidence is that Jackson's decision to invest, as it related to Mitchell, should be viewed primarily in terms of Mitchell as a friend and individual, not in his capacity as a registered representative for Bache or Burnham.

Dr. Smith was also an investor with a great deal of market experience. Smith never received any notice, written or otherwise, that Bache or Burnham was in any way dealing with Medical Logistics. Smith's only contact with either brokerage house was Mitchell. Plaintiffs have produced no evidence that would indicate that Mitchell said or did anything that would cause Smith to believe that the investments were being handled through the facilities of the firm or were in any way recommendations of the firm. Thus, although Smith testified that he relied upon Mitchell, that alleged reliance was in Mitchell's capacity as an individual and not because Smith considered the investment to be associated with Bache or Burnham.

David Peyton, like Jackson and Smith, was an experienced investor who knew when he was dealing with and through a brokerage house and when he was not. Additionally, Peyton had been involved in several speculative investments, some of them with Mitchell, which he knew to be unrelated to any brokerage firm. Peyton himself testified that he knew the Medical Logistics investment was not through Bache. Thus the involvement of Mitchell in a rather highly speculative scheme totally apart from the company for which he worked was not a novel occurrence for Peyton. As with the other plaintiffs, to permit Peyton to now claim that he relied upon Mitchell's position with Bache would be to consummate an expectation that never existed and relieve from Peyton the responsibility for his own carefully calculated actions.

Vincent and Janet Maiorana were not in the least concerned with where Mitchell worked. Mitchell was an old friend who occasionally called them up with a tip on the stock market. Although the Maioranas were aware that Mitchell was a stock broker, Mitchell made no representations to them that the Medical Logistics stock was being handled through the firms for which he was working. Their check was made payable to Medical Logistics and was picked up by Mitchell at their home. The Maioranas did not have an account with either Bache or Burnham, did not pay any fees or other costs to the firm, and except for an occasional phone conversation with Mitchell, had no contact with the brokerage houses.

The experience of the peripheral plaintiffs is similar to that of Jackson, Smith, David Peyton, and the Maioranas —they knew that Bache or Burnham was not involved in the Medical Logistics transactions. Mitchell's deposition indicates that he informed the plaintiffs that the brokerage firms were not in any way connected with his recommendation. Mr. Sonnenberg, a witness called by the plaintiffs, testified that he was aware that the brokerage firms had nothing to do with Medical Logistics and that Mitchell was not attempting to hide that fact from anyone.

Several of the plaintiffs testified that Mitchell's representations to them concerning an underwriting influenced their decision to invest. The evidence, however, shows that Mitchell did not state that Bache or Burnham were committed to underwriting Medical Logistics; he merely said that certain brokerage houses *may* underwrite and that he would present underwriting proposals to his employer. Mitchell in fact did present such proposals to both Bache and Burnham. The plaintiffs have thus failed to demonstrate any misstatement or omission by Mitchell concerning the underwriting; and Mitchell did not in-

fer thereby that either of the brokerage houses were in any way involved in the Medical Logistics venture.

Plaintiffs therefore realized that the recommendations were not sponsored or authorized by the brokerage houses and were, in Jackson's words, Mitchell's "own deal". Plaintiffs thus could not reasonably expect the house resources to be utilized to investigate Medical Logistics; if plaintiffs relied on anyone, it was Mitchell as an individual.

■ Plaintiffs argue that Mitchell's failure to adequately investigate Medical Logistics and his favorable investment recommendations violated Rule 10b–5. See, e. g., Cash v. Frederick & Co., Inc., 57 F.R.D. 71, 77 (E.D.Wis.1972). When Mitchell is held only to the less demanding duty in his individual capacity, plaintiffs have failed to meet their burden of proof in showing a negligent investigation of Medical Logistics.

Throughout the trial Medical Logistics remained something of an enigma. The only knowledgeable testimony about the company came from Palmer, the secretary-treasurer. Palmer claimed that Medical Logistics was not any type of a fraudulent scheme and that he was unaware of any illegal or disreputable aspect of the business. Plaintiffs, however, allege that the principals were irresponsible (and had criminal records), that the company's contracts were nothing but shams, and that the company was dangerously undercapitalized.

The proof as to the irresponsibility of the principals was very scanty. Apparently Reddick had some type of record relating to the fact he was a homosexual and Nolan allegedly had some drug related involvement in criminal activity as a juvenile. Plaintiffs failed, however, to adequately illuminate and specify to the Court the nature of the principals' background. Additionally, how this alleged criminal background relates to the principals' ability to run the company and · its effect—if it had been made known to the plaintiffs [9]—on the investment decision was not demonstrated at the trial. Vague allegations about criminal records, unsupported by evidence, will not support a finding of negligence.

Plaintiffs' proof as to the quality of the Medical Logistics contracts is also inadequate. The only testimony relating specifically to the contracts was that of an accountant hired by the plaintiffs to investigate the authenticity of the Medical Logistics contracts. The accountant mailed inquiries to a number of hospitals and similar agencies which had allegedly contracted for Medical Logistics' services; these inquiries requested information about the status of the contracts. A number of the responses to the inquiries indicated that the contracts did not exist. However, a few of the responses affirmed the existence of contracts and a large number were ambiguous. No follow-up to the inquiries was made and the time period covered was only through December 1969. No evidence was presented at the trial as to the extent that the contracts investigated constituted the entire Medical Logistics financial situation.

Finally, as to the financial instability of the company, the only evidence introduced by the plaintiffs was that Medical Logistics was closed for failure to pay federal taxes. Although this certainly is indicative of financial difficulties, evidence specifically detailing the company's financial status was non-existent.

Accordingly, Mitchell's failure to investigate the company must be viewed against this rather amorphous outline of exactly what the company was. The Court finds it very difficult to be able to determine what Mitchell's investigative duties were in regard to the company when the plaintiffs have failed to establish the nature of the corporation. However, Mitchell apparently went to the Medical Logistics office, inspected the premises, and interviewed the princi-

---

9. Smith was aware of Reddick's background and testified that it made no difference to him in his investment decision.

pals. Mitchell had been informed that Reddick and Nolan had worked with Dr. Smith at the Haight/Ashbury clinic and that Smith was pleased with the manner in which they had organized the clinic. Mitchell had checked Dun & Bradstreet for information about the company and requested information from the California Commissioner of Corporations. None of these investigations uncovered anything derogatory about either the company or the principals. No other evidence was introduced as to Mitchell's activities in investigating Medical Logistics; based upon such a weak showing, the Court cannot conclude that Mitchell's investigation of Medical Logistics was inadequate.

#### (c) *Relationship between plaintiffs and defendants Bache and Burnham*

■ While Mitchell was employed at Bache, only six of the plaintiffs invested in Medical Logistics (Smith, Sissman, Snow, David Peyton, Sim, Roy and Jean Peyton) and only Smith and David Peyton had accounts with the firm. During the period Mitchell was employed at Burnham, only White, Smith and Jackson maintained customer accounts at Burnham and only Jackson's account showed any activity. Thus only Smith, Peyton, Jackson and White were actually clients of the defendant brokerage houses. Investments made in Medical Logistics occurred at various times while Mitchell was employed at Bache, Burnham, and Diamond Management. Plaintiffs have been unable to articulate any coherent theory that would establish liability by the brokerage firms for investments that were made while Mitchell was not employed there or made by people who were not clients of the firm. *Cf.* Sennott v. Rodman & Renshaw, 474 F.2d 32, 39 (7th Cir. 1973); Landy v. Federal Deposit Insurance Corporation, 486 F.2d 139, 166 (3d Cir. 1973). There existed no continuing course of conduct upon which liability could be established for acts occurring after Mitchell had left

a particular brokerage house; nor were there circumstances militating in favor of extending liability to those plaintiffs who were not clients of the firms.

#### (d) *Access to information*

■ As noted above, the plaintiffs failed to prove by a preponderance of the evidence the extent of Mitchell's access to information. Bache and Burnham, having no knowledge of Mitchell's activities regarding Medical Logistics,[10] certainly had no access to information about the company. The plaintiffs' ability to obtain information was at least comparable to Mitchell's. Most of the plaintiffs went to the company's offices, inspected the premises, and discussed the company with the principals. Smith and Sissman took investment information to their respective attorneys and were advised not to invest. Jackson went to a trusted friend, described by Jackson as knowledgeable in the securities field, who told her not to "touch it [Medical Logistics]". David Peyton had extensive investment experience and had ample opportunity to investigate Medical Logistics. Pope actually worked at Medical Logistics with his half-brother, the president of the company. Mitchell possessed no information that was unavailable to the plaintiffs. See Schoenbaum v. Firstbrook, 268 F.Supp. 385, 395 (S.D. N.Y.1967), aff'd 405 F.2d 200 (2d Cir. 1967), modified 405 F.2d 215 (2d Cir. 1968), cert. denied 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969). It is perhaps appropriate to again emphasize that most of the plaintiffs were not neophytes in the investment world; they were investors who knew their way around the securities marketplace and were anxious to make a quick killing with Medical Logistics.

#### (e) *Defendants' awareness of plaintiffs' reliance*

■ Plaintiffs have produced no evidence as to Mitchell's awareness of the plaintiffs' alleged reliance. Certainly

10. See discussion of Bache and Burnham's § 20 liability *infra.*

Bache and Burnham had no knowledge of their reliance; they were not even aware of the existence of most of the plaintiffs.

### (f) Defendants' activity in initiating transactions

█ Although Mitchell was receiving a finder's fee for touting the Medical Logistics stock, his role in introducing Medical Logistics to the plaintiffs appears to be marginal; he certainly did not employ any type of pressure tactics or attempt to utilize his position at the brokerage houses to encourage investment. Dr. Smith was the one who introduced Medical Logistics to Mitchell; it was Smith's enthusiasm at the first discussion of Medical Logistics that initiated Mitchell's interest in the company. David Peyton found out about the company when Mitchell approached him, not to sell him stock, but to arrange for a private loan for Smith. Peyton, always on the alert for a killing, was quick to jump on the Medical Logistics bandwagon after he questioned Mitchell about the purpose for the loan. Jackson first learned of Medical Logistics when she overheard one of Mitchell's phone conversations and she asked him about the company. Pope learned about the investment opportunity in the company through Reddick; Pope had never even met Mitchell. The other plaintiffs learned of the company through Jackson (i. e., Harvey, Sullivan, White), Peyton (i. e., Sim, the Newnums, Roy and Jean Peyton), and Smith (i. e., Sissman, Snow).

### (g) Benefit to defendants

█ The only factor that even arguably militates toward the creation of the 10b–5 duty is the fact that Mitchell was receiving a benefit from the sale of the Medical Logistics stock—the finder's fee. Mitchell however was not hiding from the plaintiffs the fact that he was receiving a fee and, as noted above, did not apply any undue pressure upon the plaintiffs in order to maximize his gain. Additionally, it should be noted that the brokerage houses received no benefit from the Medical Logistics transactions; no fees were paid to the house and no business activity was generated.

The above discussion of the factors to be considered in examining the duty question clearly indicates that there existed no duty running from Mitchell to the plaintiffs. Accordingly, plaintiffs have failed to prove a violation of Rule 10b–5 and cannot recover upon that basis.

### (2) Secondary Liability of Bache and Burnham

Although the Court has determined that there existed no violation of Rule 10b–5, the interrelationship of the brokerage houses with Mitchell is such an important factor in the determination of the flexible duty standard, the issue of secondary liability should be discussed. Additionally, the plaintiffs based their entire case primarily upon the issue of secondary liability and the Court considers it appropriate to address the legal issues raised at trial.

Plaintiffs do not seriously contend that Bache or Burnham committed acts violative of Rule 10b–5. Instead, any liability attaching to the brokerage houses is claimed to be derivative—i. e., based upon the acts of Mitchell. Accordingly, plaintiffs have presented two theories upon which the secondary liability of Bache and Burnham can be established: Section 20 "controlling person" liability and agency principles of respondeat superior.

█ Section 20 of the Securities Exchange Act of 1934 creates secondary liability upon any authority who controls any person liable under the act.[11] Bache

---

11. The statute reads as follows:

"(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable,

and Burnham, as employers of Mitchell in his capacity as a registered representative, certainly qualify as a controlling person during those time periods Mitchell was employed by the firms. Kamen & Co. v. Paul H. Aschkar & Co., 382 F. 2d 689, 697 (9th Cir. 1967). Liability under this provision, however, is subject to a good faith defense. Hecht v. Harris, Upham & Co., 283 F.Supp. 417, *supra.*

■ Agency principles of respondeat superior differ significantly from Section 20 liability. Once the appropriate agency relationship is established (*i. e.*, authority to act in a manner within the scope of employment), liability on the part of the principal is absolute—no good faith defense is available. Kamen & Co. v. Paul H. Aschkar & Co., *supra;* Blackburn v. Witter, 201 Cal.App.2d 518, 19 Cal.Rptr. 842 (1962).

The initial question the Court must confront concerns the applicability of both theories to the 10b–5 claim; there is considerable authority for the proposition that only the Section 20 controlling person liability can be utilized in cases involving the 1934 Securities Exchange Act. The federal courts that have addressed the issue have been split and the Ninth Circuit has adopted an ambiguous position on the matter. A review of the cases that have discussed the issue and an analysis of the Ninth Circuit case that has touched on the question indicate that Section 20 was designed to be the sole method of establishing secondary liability and that agency principles are not in concert with the guidelines set forth in Section 20.

The Sixth Circuit and the Fourth Circuit have expressly held that Section 20 [12] does not limit the availability of agency principles for attaching secondary liability in cases involving violation of the Securities Exchange Act. Armstrong, Jones & Co. v. SEC, 421 F.2d 359, 362 (6th Cir. 1970), cert. denied 398 U.S. 958, 90 S.Ct. 2172, 26 L.Ed.2d 543 (1970); Johns Hopkins University v. Hutton, 297 F.Supp. 1165 (D.Md.1968), aff'd in part, rev'd in part and remanded 422 F.2d 1124 (4th Cir. 1970). The Fifth Circuit has adopted sub silentio a similar approach. Lewis v. Walston & Co., Inc., 487 F.2d 617 (5th Cir. 1973). See also Ruder, Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy, In Pari Delicto, Indemnification, and Contribution, 120 Penn.L.R. 597 (1972).

The Second Circuit, however, has indicated that Section 20 is to be the exclusive method of establishing secondary liability. Lanza v. Drexel & Co., 479 F. 2d 1277 (2d Cir. 1973); SEC v. Lum's, Inc., 365 F.Supp. 1046, 1061–1064 (S.D. N.Y.1973). The *Lanza* and *Lum's* decisions were in part based upon Myzel v. Fields, 386 F.2d 718 (8th Cir. 1967), cert. denied 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1967), an Eighth Circuit case which held that Section 20 is to be the sole measure of secondary liability. Additionally the Seventh Circuit has been careful to distinguish between liability under Section 20 and liability accruing under agency theory. SEC v. First Securities Co. of Chicago, 463 F.2d 981 (7th Cir. 1972).

The Ninth Circuit has not expressed a definitive position on this issue, although it provided some indication about how the matter should be handled in Kamen & Co. v. Paul H. Aschkar & Company, *supra.* The *Kamen* case has generated some confusion, apparently because of its extensive discussion of agency theory. However, the *Kamen* discussion of ostensible authority related, not to the federal securities acts, but to pendant state claims of fraud; the *Kamen* court had treated the state and federal claims separately, applying the agency principles only to the state claims. As

unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

12. Or its counterpart in the 1933 Act, Section 15 which is treated identically. Kamen & Co. v. Paul H. Aschkar & Co., *supra.*

to the Section 20 (and Section 15 of the 1933 Act) liability the court found no bad faith and held that "Kamen, concededly 'a controlling person' is, however, not vicariously liable for the acts of the agent under the provisions of the Securities Act of 1933." [13] Kamen & Co. v. Paul H. Aschkar & Company, *supra* at 697. The thrust of *Kamen* thus seems to be toward establishing Section 20 as the sole means of creating secondary liability under federal securities law.

The position adopted by the Second Circuit and implied in the *Kamen* case has considerable merit. The intent of Congress in creating Section 20 was essentially twofold: to maximize the coverage of the Act by extending potential liability to even those persons having mere control; yet to introduce culpability (*i. e.*, lack of good faith) as an element necessary to permit recovery. Both of these goals tend to be contrary to the dictates of respondeat superior. Agency law is relatively restrictive in establishing who will be responsible for the acts of an agent; yet Section 20 was designed to eliminate technical requirements as to the traditional "master-servant" relationship and extend liability to anyone having "control". Lanza v. Drexel & Co., *supra*.

Additionally, according to agency principles, once the authority relationship is established, liability is complete and absolute. Liability under Section 20, on the other hand, is subject to a good faith defense. *Compare* Rutherford v. Rideout, 11 Cal.2d 479, 484, 80 P.2d 978, 981 (1938) which states that "[t]he principal is subject to liability under the rule . . . although he is entirely innocent, although he has received no benefit . . . and, . . . although the agent acts solely for his own purposes" *with* Lanza v. Drexel & Co., *supra* at 1299 which states that "[t]he intent of Congress in adding this section [20], passed at the same time as the amendment to Section 15 of the 1933 Act, was obviously to impose liability only on those . . . who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons."

To superimpose agency law over Section 20 would be to create a strict liability standard—a standard specifically rejected by Congress when Section 20 was adopted. *Compare* the Senate's proposed standard of "insurer's liability" (S.Rep. 47, 73 Cong. 1st Sess. 5 (1933)) *with* the position of the House which was finally adopted (H.R.Rep.No. 1383, 73 Cong. 2d Sess. 5). Since Section 20's broad definition of control would always include those liable under respondeat superior theory, if agency principles were adopted the good faith defense specifically contained in Section 20 would be emasculated.[14]

Accordingly, the liability of Bache and Burnham for the acts of Mitchell alleged to violate Rule 10b–5 will be governed only by Section 20 and subject to the good faith defense contained therein.

The test of liability under Section 20 is that the controlling person ". . . must have acted in bad faith and directly or indirectly induced the conduct constituting a violation or cause

---

13. Although the court determined that the defendants were not vicariously liable under the securities acts, it did indicate that ostensible authority existed and reversed the lower court's decision as to the state claim. It would thus appear that if agency principles were applicable to the federal claim, liability would have been found for the federal part of the case as well. Kamen & Co. v. Paul II. Aschkar & Company, *supra* at 696.

14. Thus the only persons able to utilize the good faith defense would be those involved in a situation where no agency relationship had been established. Accordingly, two groups of potential defendants would be created—those controlling persons who also happen to meet agency requirements as a principal and thus will not have a good faith defense available and those controlling persons not considered principals who will not be held strictly liable. The Court can determine no rational reason for setting up different standards of liability within the federal securities framework.

of action". Kamen v. Paul H. Aschkar & Company, *supra* at 697. This test has been utilized in a number of cases in which an employer has been held liable under Section 20 for the acts of his employee. See, *e. g.,* Hecht v. Harris, Upham & Co., 283 F.Supp. 417, *supra*; Lorenz v. Watson, 258 F.Supp. 724 (E.D.Pa.1966). The court in *Hecht* further articulated the appropriate standard under Section 20: ". . . to satisfy the requirement of good faith it is necessary to show that precautionary measures were taken to prevent the violation and, further, that failure of the controlling person to maintain and diligently enforce a proper system of internal supervision and control constitutes participation in the misconduct and the violation will be deemed to have been committed, not only by the controlled person, but also by the controlling person who did not perform his duty to prevent it." Hecht v. Harris, Upham & Co., 283 F. Supp. at 438.

There can be no doubt that Bache and Burnham lacked actual knowledge of Mitchell's activities in selling Medical Logistics. Plaintiffs argue that the brokerage houses had constructive knowledge of Mitchell's activities and, had proper supervisory procedures been utilized, should have discovered the conduct of their registered representative. In support of the allegation that Bache and Burnham had constructive knowledge of Mitchell's involvement with Medical Logistics,[15] plaintiffs allege four acts that they claim should have, at least, been sufficient cause to further investigate Mitchell's activities: (1) letters and telephone calls received at Bache or Burnham and discussions with clients at Bache or Burnham; (2) Mitchell's underwriting proposals; (3) the Rosegold and Dayton transactions; (4) Burn-

ham's failure to investigate Mitchell's background prior to hiring him.

The evidence was unclear as to how many Medical Logistics letters were actually sent to Mitchell while he was employed at Bache or Burnham. Although some of the correspondence was addressed to Mitchell at the Bache and Burnham offices, some of the testimony indicated that Mitchell may have picked up the letters in person before they were sent.

It can be concluded, however, that at least some correspondence from Medical Logistics, addressed to Mitchell, was received at the Bache or Burnham offices. Any correspondence received at the brokerage houses was sent immediately to Mitchell unopened or unread.[16] It is thus reasonable to conclude that Bache and Burnham were probably unaware of the existence of the Mitchell-Medical Logistics correspondence. Plaintiffs argue that the duty of adequate supervision requires that all incoming mail be screened and read before it is turned over to the registered representative.

The Court is unwilling to saddle a brokerage firm with the obligation of inspecting every single piece of correspondence addressed to a registered representative. The letters in question in the instant case were addressed specifically to Mitchell. At the time he was receiving the correspondence Mitchell was performing his job adequately, if not spectacularly, and was under no suspicion. Without some type of legitimate reason to prompt the examination of incoming mail addressed to a particular registered representative, the Court does not consider it a breach of the good faith standard contained in Section 20 for a brokerage house to refrain from reading incoming mail.[17]

---

15. Mitchell's involvement with Medical Logistics violated several house rules and, had the defendant brokerage houses been aware of it, would certainly have required further investigation.

16. As noted in the Findings of Fact, *supra,* Bache did not open mail addressed to an individual registered representative unless he

was not in the office by a certain time; Burnham opened the mail only to extract currency or securities and did not read the mail.

17. The defendants argue that such examination of personally addressed incoming mail (and telephone calls) would be illegal and unconstitutional. The Court, having deter-

 In a similar vein, plaintiffs contend that certain phone calls between Mitchell, while he was at the office, and Medical Logistics investors should have been uncovered by the firms' supervisory personnel. Plaintiffs apparently believe that the brokerage houses are under a duty to monitor all phone calls of every registered representative. Such a policy, like the opening of personal mail, is unreasonable. Section 20 does not anticipate brokerage firms resorting to clandestine subterfuge which would destroy all privacy between the broker and client. The firms are not under an obligation to spy upon their registered representatives—especially if the registered representatives have provided no indicating of any wrongdoing. Under certain circumstances a brokerage firm may be obligated to further investigate the activities of a particular registered representative and keep a watchful eye upon his actions. The extent of such surveillance may well depend upon the nature of the wrongful activities suspected. Where, however, a registered representative has performed competently and, to the best of his firm's knowledge, within the boundaries of the law and house rules, there exists no duty for the brokerage firms to monitor his telephone or read his incoming mail.

 Plaintiffs maintain that Mitchell's presentation of Medical Logistics to his supervisors for underwriting was sufficient notice to the brokerage firms that Mitchell was involved in unauthorized activities. The evidence, however, demonstrated that there was nothing irregular about the underwriting proposals and nothing that would foster suspicion. The underwriting proposals were summarily rejected; the manager at Bache could not even remember discussing the matter. Both managers testified that it was common practice for registered representatives to bring to

the manager's attention companies for underwriting consideration. Such an action did not indicate that the representatives were engaged in any prohibited activity; in fact exactly the opposite indication was given since, if the brokerage firm had seriously considered the company proposed for underwriting, an extensive investigation of the company would occur.

The manager of Burnham was also aware, through Mitchell's underwriting proposal, that Mitchell had invested money in Medical Logistics. Such information, standing alone, is not sufficient to support suspicions that Mitchell was doing anything illegal. The manager of Burnham testified that it was not uncommon for registered representatives to invest in companies they present as underwriting proposals; such investments would not be an indication that the registered representative was touting the company to his clients or that he was participating in the management of the company. As noted above, the fact that Mitchell would bring the investment to the attention of his supervisor is some indication that he had nothing to hide about the company.

 Plaintiffs contend that Mitchell's involvement with Dayton and Rosegold should have alerted the brokerage houses as to the broker's propensity to sell unregistered, unrecommended securities to his clients. Bache and Burnham were not, however, aware that Mitchell was recommending the Dayton and Rosegold stock any more than they were aware of the Medical Logistics transactions. Burnham was aware that Mitchell had received a commission for a sale of Rosegold through a brokerage firm handling such stocks, but such a transaction indicated only that Mitchell was complying with company policy and selling low price securities out of his client's portfolio.

mined that no duty exists to examine all incoming mail, does not consider the merits of this argument. There exists no doubt, however, that the legality or constitutionality of such actions is a matter to which Bache and Burnham must devote considerable attention.

The present, rather confused, state of the law in this area justifies the cautious position taken by the brokerage firms that absent significant cause for suspicion, phones will not be monitored or mail opened. See, e. g., 18 U.S.C. § 2511.

■ Finally, plaintiffs maintain that Burnham failed to adequately investigate Mitchell's background prior to hiring him. Mitchell, however, had satisfied all the requirements set down by the New York Stock Exchange and other appropriate investigative authorities to act in the capacity of a registered representative. Upon being informed by such authorities that Mitchell's credentials were in order, and after having been informed by Mr. Rosasco, the Bache manager, that he (Rosasco) knew of nothing that would prevent Mitchell from being a qualified registered representative, Burnham hired Mitchell. The procedure utilized by Burnham in investigating Mitchell's background was appropriate and was not negligent.

During the investigation of Mitchell's background, Burnham became aware that Mitchell had a bank account in which certain fee splitting funds were placed. As a condition of his employment Mitchell agreed to terminate this account. The significance of the account was not made clear at the trial and its relationship to Medical Logistics was equally ambiguous. Apparently the account was not terminated and plaintiffs argue that, had the defendants maintained a proper system of supervision, they would have discovered that the account was still active. Plaintiffs, however, have failed to prove any negligence by Burnham in following up the account or the account's significance to Medical Logistics.

■ As the above discussion indicates, Bache and Burnham had no knowledge, actual or constructive, of Mitchell's activities regarding Bache or Burnham. Nor did there exist "red flags" that should have tipped the defendants off as to the Medical Logistics investments. Accordingly, the plaintiffs have relied primarily upon the defendants' alleged lack of supervisory procedures as establishing liability under Section 20.

The evidence at trial indicated that Bache and Burnham utilized an adequate system of supervision. All of Mitchell's records were carefully scrutinized and checked. Mitchell's clients received complete statements of their accounts and were requested to contact the company if any irregularity in either the statement or the handling of the account occurred. Regular meetings were held at which the in-house rules were discussed and company policy outlined. The registered representatives were well aware of their legal responsibilities and the legal consequences flowing therefrom.

Plaintiffs rely upon Lewis v. Walston & Co., Inc., *supra* as supportive of their allegations that Bache and Burnham failed to adequately supervise Mitchell. In *Lewis* the court labelled arguments stressing the fact that the stock was unregistered and thus did not involve the execution of an order through the brokerage house as superficial. Lewis v. Walston & Co., *supra* at 624. The court, however, was addressing the issue in a different context than exists in the instant case—both in a legal and factual sense. The legal issue in *Lewis* was concerned with respondeat superior—*i. e.*, whether or not the registered representative's action was within the scope of her employment. In the instant case, the Court's concern is within the adequacy of supervision. One need not demonstrate inadequate supervision in order to incur liability under a respondeat superior theory; the scope of employment issue in *Lewis* is thus much broader than the issue in the instant case.

More importantly, however, are the factual distinctions between the instant case and *Lewis*. The manager of the defendant brokerage house in *Lewis* was aware of the registered representative's involvement with the securities in question; he knew that the registered representative had touted the stock; and the manager had even participated in a meeting with the plaintiffs at which the stock was discussed. The fact that the stock did not go through the house channels was thus irrelevant; the manager himself already knew of its existence and his employee's role. The facts in the instant case do not even approach

those in *Lewis*—those responsible for Mitchell's supervision had no knowledge of Mitchell's participation in the Medical Logistics investment scheme.

That the brokerage firm's daily records are important to establish the inadequacy of house supervision is demonstrated by Hecht v. Harris, Upham & Co., 283 F.Supp. at 439 and Lorenz v. Watson, *supra.* In both cases liability for churning [18] was predicated upon the information available to the brokerage firms through their own records. The absence of unusual trading activity may not, in itself, absolve a brokerage house of all further duty to supervise. The records and accounts are, however, of critical importance in insuring a complete and adequate supervisory system.

SEC v. Lum's, *supra,* deals with the supervisorial problem in a context more closely related to the instant case than does *Lewis.* In *Lum's* the brokerage firm's supervisory system included discussions with the brokers in order to address particular legal problems (in this instance, problems dealing with inside information) and persistent memoranda stressing company policy and legal limitations and responsibilities. The court in *Lum's* held that this procedure satisfied the brokerage house's responsibility of supervision insofar as the insider trading was concerned. In the instant case, Bache and Burnham utilized a similar procedure—*i. e.,* making sure that each employee was aware of his legal duties through the use of seminars, meetings and memoranda.

The Court thus concludes that Bache and Burnham's supervisory activities were consistent with those of other brokerage firms and in accordance with sound management procedure. The Court has difficulty envisioning what further steps could have been taken by either Bache or Burnham short of total twenty-four hour surveillance. Most of the meetings between plaintiffs and Mitchell (and some of the plaintiffs did not even meet Mitchell) did not occur at the Bache or Burnham offices. Those meetings that did occur at the offices were with clients who had "legitimate" business with Bache and Burnham. As discussed above, no business was generated through the brokerage firms themselves and no record of any Medical Logistics transactions existed. The feasibility of monitoring telephone calls and incoming mail is also discussed above. All house rules were in effect and applicable to Mitchell. The Court has been unable to find any authority extending liability to a brokerage house utilizing those procedures employed by Bache and Burnham. Accordingly, the Court considers that the defendant brokerage houses acted in good faith and are thus not liable under Section 20.

### FRAUD CLAIM

As discussed above in connection with the duty standard applicable to 10b–5, plaintiffs have failed to prove any fraud by Mitchell. Accordingly no fraud can be attributed to Bache or Burnham through the doctrine of respondeat superior.

### VIOLATION OF NASD, NYSE RULES

Although there exists a serious question of whether there can be a private action for violation of exchange rules,[19] the Court's determination that the brokerage houses' supervisory system was adequate and that the plaintiffs' investments were suitable disposes of this claim as well.

### NEGLIGENCE CLAIM

Although the plaintiffs failed to articulate their theory behind the negligence claim against the defendant brokerage houses, it is clear from the above discussion that Bache and Burnham acted in a reasonable and prudent

---

18. *I. e.,* engaging in excessive trading for the purpose of providing commissions.

19. See, *e. g.,* Colonial Realty v. Bache & Co., 358 F.2d 178 (2d Cir. 1966) ; Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135, 142 (7th Cir. 1969) ; Wells v. Blythe & Co., Inc., 351 F.Supp. 999 (N.D. Cal.1972) ; Hecht v. Harris, Upham & Co., 283 F.Supp. 417, *supra.*

manner with respect to Mitchell and fulfilled their respective responsibilities.

### BREACH OF FIDUCIARY DUTIES

Plaintiffs have failed to prove that either Bache or Burnham violated any fiduciary duty or acted in a manner not consistent with their responsibilities to the customers of the firms.

Accordingly, it is ordered that judgment be, and the same is, hereby rendered against the plaintiffs as to Bache and Burnham, and defendants Bache and Burnham shall be entitled to their costs.

It is further ordered that this Memorandum will constitute the Findings of Fact and Conclusions of Law in accordance with Fed.R.Civ.P. 52. Defendants Bache and Burnham will within twenty days from notice of this order prepare, serve and lodge with the Court a form of final judgment in favor of the defendants Bache and Burnham and against the plaintiffs on the issue of liability.